# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RECEIVED

APR 0 4 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

JANET HOWARD )

    Plaintiff, )

)

v. )

)    Civ. No. 08-0421 (PLF)

CARLOS GUTIERREZ )
SECRETARY, )
U.S. DEPARTMENT OF COMMERCE, )

    Defendant. )

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AND FOR AN EXPEDITED HEARING. AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### A.     INTRODUCTION

Pursuant to Fed. R. Civ. P. 65 and D.C. Local Rule 65, Plaintiff Ms. Janet Howard ("Ms. Howard" or "Plaintiff"),  submits this reply brief Pro Se in support of her motion for a preliminary injunction and for an expedited hearing and her Opposition to Defendant's Motion to Dismiss.

In her Motion for a Preliminary Injunction, Plaintiff asks this Court to order the Defendant, United States Department of Commerce ("DoC" or "Defendant"), to cease and desist immediately all discriminatory and retaliatory employment actions taken against Plaintiff because of her  (1) well-recognized activity at DoC opposing race discrimination; (2) pending ADA case before the Court; (3) multiple party complaint (05-1968 JDB) before the Honorable John D. Bates; (4) past leadership role in the race-based discrimination class action lawsuit

1

against the DoC; and (5) present leadership as class agent in the pending race-based class action (*Janet Howard, et. al. v. Carlos Gutierrez, Secretary, U.S. Department of Commerce*) at the Equal Employment Opportunity Commission (Agency No. 08670082).

In addition, Plaintiff asks this Court to Order the DoC to cease and desist from initiating further harmful actions against Plaintiff, pending final resolution of a related matter before this Court scheduled April 9, 2008.   Plaintiff asserts that the Department's actions to remove her based on deficient performance, is a pretext for retaliation.  **As Defendant's counsel conveyed to Court Clerk and Plaintiff, *absent a temporary restraining order, the Defendant seeks to terminate Plaintiff from employment before her jury trial against the DoC, scheduled April 21, 2008.*  Hence, Plaintiff's petition for injunctive relief is not precipitated based on any speculative action that Defendant plans to take; but rather Plaintiff's relief is being sought to cease and desist DoC from taking impending action as articulated by the Defendant's counsel.**

## B.    PROCEDURAL BACKGROUND

On March 11, 2008, Janet Howard filed a *Pro Se* Complaint and a Motion for a Temporary Restraining Order ("TRO") and a Preliminary Injunction ("PI") in the United States District Court for the District of Columbia, alleging the DoC's retaliation against Plaintiff with a proposed removal letter because of her prior EEO activity and involvement in a protected activity.

On March 27, 2008, the United States Department of Justice ("DoJ"), on behalf of the DoC, filed its Opposition to the Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction and a motion to dismiss under Fed. R. Civ. P. 12(b) (l) and

12(b) (6). Plaintiff herewith files her reply to the DoC's Opposition to Plaintiffs Motion for a Preliminary Injunction.

## C.    PLAINTIFF'S POSITION AT THE AGENCY

The U.S. Department of Commerce (DoC) is an Executive Branch agency and consists of various bureaus, one of which is the Bureau of Industry and Security ("BIS"). BIS's mission is to advance U.S. national security, foreign policy and economic interests.    The Office of Enforcement Analysis ("OEA") is a unit within BIS. OEA's mission is to carry out the Agency's export enforcement responsibilities as mandated by the Export Administration Act of 1979 and it's implementing regulations.

Plaintiff is an Export Compliance Specialist assigned to OEA. She has been employed by the Defendant since April 15, 1983. As an Export Compliance Specialist, Plaintiff's primary responsibilities, among others, include reviewing export license applications and, where appropriate, recommending end-use checks. Moreover, because Plaintiff is responsible for helping to ensure that exports are not sent to, and ultimately do not fall into the hands of, individuals seeking to harm the interests of the United States or its citizens. Plaintiff's position implicates national security concerns.

Plaintiff's first-level supervisor is Todd Willis, GS-1801-15, Assistant Director, OEA. Plaintiff's second-level supervisory is Glenn Krizay, Senior Executive Service, Director, OEA.

## D. THE DoC'S DISCRIMINATORY AND RETALIATORY CONDUCTED AGAINST PLAINTFF

As a result of Plaintiff's opposition to discriminatory practices at the DoC, she has been subjected to retaliation at various points throughout her employment. Since 2001, Plaintiff has been treated differently with regard to promotions, assignments, ratings, awards, treatment

and terms and condition of employment. Consequently, Plaintiff filed a class complaint in 1995, which was later certified at the Equal Employment Opportunity Commission in 2001. The case was filed in Court on October 5, 2005. However, due to the class attorneys' error in not filing under Local Rule 23, the case which was never heard on merits was consequently dismissed. In response to Plaintiff's class action activity in 2001, DoC began initiating action to get rid of the Plaintiff. Rather than resolve issues raised by Plaintiff, Defendant fostered a hostile work environment against Plaintiff and established a slush fund, of taxpayer's money, called the *"Class Action Fund." This budgetary fund, which charged all operating units and was widely circulated to DoC budget offices, specifically named "Janet Howard" against the Commerce Secretary.* (See **EXHIBIT I**)    {Testimony to this effect will be heard in a related case before this Court}.   As a result of DoC's discrimination and retaliation, Plaintiff has suffered emotional trauma, humiliation, and stress-induced physical ailments.    Significantly, the DoC's retaliatory actions, including but not limited to those described above, have had a chilling effect on class members in the pending Howard race based discrimination class action. Given the DoC's history of retaliation against Plaintiff and the chilling effect that this retaliation has had on class members in the pending race discrimination class action, Plaintiff respectfully requests that she receive a prompt hearing. It is also requested that this Court issue an Order to the DoC to cease and desist until the pending resolution of the Plaintiff's related claims on the merits.   Plaintiff moves herewith for a hearing on the Preliminary Injunction Motion, and respectfully requests that this Court grant Plaintiff's Motion and schedule a hearing as soon as it is convenient for the Court.

## E.    SUMMARY OF ARGUMENT

### 1.    Plaintiffs Employment History at DoC and Her Vocal Opposition Against DoC's Discriminatory Policies

Janet Howard is an African-American who has been employed by the United States Department of Commerce ("DoC") within the Office of Bureaus of Industry Security (BIS) (formerly Bureau of Export Administration (BXA)) for approximately 25 years. *__On February 27, 2008, Plaintiff was issued a Notice of Proposed Removal two days after filing a second race-base class action (February 25, 2008)__*.

Plaintiff has assumed a leadership role among African-American employees at the DoC for many years. Plaintiff has spoken out against the DoC's racially discriminatory practices; and serves as class agent in the pending race-based discrimination class action lawsuit against the DoC; has been actively involved in organizations such as the Notification and Federal Employee Anti-Discrimination and Retaliation Coalition ("NO FEAR"); testified on Capitol Hill during May 2007 Washington Whistleblower Week; and serves as the President of the Federal Employees Legal Defense Fund, Inc. ("FELDF").

## F.    DOC'S RETALIATION AGAINST PLAINTIFF

The DoC has retaliated against Plaintiff by subjecting her to, *inter alia,* harassment and a hostile work environment; Placement on an unwarranted and questionable Performance Improvement Plan (PIP); Notice of Proposed Removal; denial of employment opportunities routinely extended to white employees; disparate terms and conditions of employment; and other forms of discrimination. Days after Plaintiff appeared before the Honorable Judge John Bates on January 26, 2007, Defendant held a meeting with Plaintiff to issue her an oral warning stating that

her performance was deficient.  This notice came early February 2007 just days after the court

hearing.  **It is important to note during the hearing the Defendant's counsel argued that**

**Plaintiff was a – *"prolific* filer."  Judge Bates informed Defendant's counsel that: *"One is not***

***prohibited from filing complaints for subsequent alleged discrimination."*** Defendant's assertion

that Plaintiff is a ***"prolific violator of her civil rights"*** and that Defendant's actions to remove

Plaintiff her under ***"the guise of poor performance"*** is being done to halt her exercising her Title

VII rights.

### G.  THE CHILLING EFFECT ON AFRICAN AMERICANS AND THE PLAINTIFF RESULTING FROM DOC'S RETAILIATORY ACTIONS AGAINST PLAINTIFF

The DoC's retaliatory actions against Plaintiff have caused a chilling effect on DoC's

African American employees.  Since dismissal of the class action lawsuit against the DoC due

to the failure of the class attorney to file for class certification under Rule 23, the DoC has

increased their use of the PIP to remove high performing veteran African-American employees

from their government jobs.  Plaintiff is aware of three Blacks in Government (BIG) members,

including BIG's former Chapter President, who have been targeted for removal under the PIP.

They all had opposed race discrimination at the DoC, and all had been identified as potential

members of the certified class complaint filed in U.S. District Court on October 5, 2005.

### H.    LEGAL ANALYSIS

I.    **Legal Standard for Granting a Preliminary Injunction**

To determine whether an injunction is appropriate this Court should balance the

following four factors: "(1) the likelihood of Plaintiff's success on the merits; (2) the threat of

irreparable injury to the Plaintiff in the absence of an injunction; (3) the possibility of substantial harm to other interested parties from a grant of injunctive relief; and (4) the interest of the public." Saunders v. The George Washington Univ. 768 F. Supp. 843 (D.D.C. 1991) (citing Wagner v. Taylor, 836 F.2d 566, 575 (D.C. Cir. 1987); see also Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2951 (1995). The issuance or denial of a preliminary injunction rests on the sound discretion of the Trial Court.

Courts around the country have routinely granted preliminary injunctions to restore plaintiffs to the *status quo* as it existed immediately before the defendant's wrongful conduct. See Riggs Investment Management Corp. v. Columbia Partners, 966 F. Supp. 1250 (D.D.C. 1997) (injunction ordered where former chief executive officer had started a new corporation giving the impression that the new corporation was no different from the old company); Goto.com v. Walt Disney Company, 202 F. 3d 119 (9th Cir. 2000) (a preliminary injunction reinstated in logo infringement case); Altira Group LLC v. Philip Morris Companies Inc., 2002 WL 1363581 (D. Colo. 2002) (citing Mantle Ranches v. U.S. Park Service, 945 F. Supp. 1449 (D. Colo. 1996) (the purpose of an injunction is to preserve the *status quo ante,* the last state of peaceable, uncontested conditions that proceed the pending controversy); Gilder v. PGA Tour. Inc., 936 F. 2d 417 (9th Cir. 1991) (a preliminary injunction is necessary to preserve the *status quo ante* pending a hearing and a decision on the merits; injunction granted); see also Taylor By and Through Taylor v. Honig. 910 F. 2d 627 (9th Cir. 1990); Los Angeles Memorial ColiseumCom'n v. National Football League. 634 F. 2d 1197, 1200 (9th Cir. 1980) (the purpose of a preliminary injunction is to preserve the *status quo ante litem* pending determination on the merits); see generally 16 C. Wright, A. Miller, E. Cooper & B. Gressman, Federal Practice & Procedure § 3942, at 316-17 (1997).

The D.C. District Court has granted preliminary injunctions in cases similar to the one at bar. See Bonds v. Heyman. 950 F. Supp. 1202 (D.D.C. 1997) (federal employee's motion for preliminary injunction granted to prevent the employer from terminating the employee pursuant to a reduction-in-force, where the employee had filed a complaint of retaliation for engaging in protected activity.); Neal v. Department of Corrections, 1996 U.S. Dist. Lexis 7967 (D.D.C. 1996) (employee's motion for preliminary injunction granted in retaliatory discharge matter); Saunders v. The George Washington Univ., 768 F. Supp. 843 (D.D.C. 1991) (terminated employee's motion for preliminary injunction granted, ordering Plaintiff reinstated after retaliatory discharge); see also Perry v. Golub, 400 F. Supp. 409 (N.D. Ala. 1975) (preliminary injunction to prevent the reassignment of a federal employee granted, where the reasons for, and the procedures followed in implementing, the reassignment were questionable).

## I.   ARGUMENT

Courts employ a three step process to evaluate retaliation claims such as this one. Moore v. Summers. 113 F. Supp. 2d 5, *, *22 (D.D.C. 2000). First, a Plaintiff must make out *a prima facie* case of retaliation. Id. See also. Cones v. Shalala. 339 U.S. App. D.C. 299, 199 F.3d 512, 520 (D.C. Cir. 2000). To accomplish this, the "Plaintiff must show (1) that he or she has engage in statutorily protected behavior, (2) that his or her employer took an adverse personnel action against him or her, and (3) that a causal connection existed between the protected activity and the adverse action. Moore v. Summers, 113 F. Supp. 2d 5 at *22 (citing Cones v. Shalala. 199F.3dat521).

Finally, the timeline, attached as **EXHIBIT 2,** clearly establishes that there is a causal connection between Plaintiff's statutorily protected activities and DoC's adverse action. DoC's adverse employment actions taken against Plaintiff are close in time to her filing a recent

class action and close to the proximity of her pending ADA Pre-Trial Hearing scheduled April 9, 2008, and Jury Trial scheduled April 21, 2008, before the Honorable Judge Paul Friedman.

1.    **Plaintiff Maintains a Significant Likelihood of Success on the Merits of Her Claim**

Defendant has argued that Plaintiff will not suffer irreparable harm. Plaintiff proffers the contrary as presented in this motion. However, it is notable that a particular strong showing on one factor may compensate for a weak showing on one or more of the other factors. See Serono labs., 158 F. 3d at 1318. *"An injunction may be justified for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury."*

At the case at bar, Plaintiff is more likely than not to succeed on merits. Notably, the ADA case before the court, which the Plaintiff has defeated Defendant's Summary Judgment, is interrelated to pending removal action. It is highly likely that the Plaintiff will succeed on the merits of the case which is founded on Performance Improvement Plan (PIP) **(See Exhibit 3)**, given the DoC in its' retaliatory haste, effected a number of procedural errors and management inconsistencies to execute Plaintiff's removal. **(SEE EXHIBIT 4 and 5)**. Also, DoC is aware that claims brought by Plaintiff Howard, whether individuals or collectively when heard by the Court will most likely prevail.   For this reason, the Defendant's have established a budgetary fund to litigate claims asserted by Plaintiff Howard.   **(See EXHIBIT 1 –Department of Commerce's Advances and Reimbursement Handbook).**

2.    **The Class Of African American Employees in the Pending Race-Based Discrimination Class Action Lawsuit at the EEO, of Which Plaintiff Is the Class Agent, Faces The Threat Of Irreparable Injury In The Absence Of An Injunction.**

.     The Court, in determining whether an injunction is appropriate, should consider whether there is a "threat of irreparable injury to the Plaintiff in the absence of an injunction."

Saunders, 768 F. Supp. at 844. The requirement that the Plaintiff establish that irreparable harm will follow if a preliminary injunction is not granted has been held to mean that the Plaintiff must show that the injury is "imminent, creating a clear and present need for equitable relief to prevent harm." Varicon Int'l v. Office of Personnel Mgm't.. 934 F. Supp. 440, 448 (D.D.C. 1996). Without this court's issuance of a preliminary injunction, Plaintiff and the class of African American DoC employees, of which she is the class agent, face irreparable harm. Where the federal government is the employer, Courts have held that the standard for showing irreparable harm is higher. The Supreme Court has held that a federal employee must show that "extra-ordinary irreparable injury" will occur without the granting of a preliminary injunction. Sampson v. Murray, 415 U.S. 61, 83-84, 94 S. Ct. 937, 39 L. Ed 2d 166 (1974). In interpreting Sampson, the D.C. Courts have established that "a Plaintiff who demonstrates that an adverse personnel action is likely to have a chilling effect on other employees who, after witnessing [the adverse employment action,] would now refuse to file claims in fear of reprisals, would also meet Sampson's barrier." Bonds v. Heyman.. 950 F. Supp. 1202, 1214-15 (D.D.C. 1997).

In a case directly on point, Segar v. Civiletti, 516 F. Supp. 314 (D.D.C. 1981), the Court granted Plaintiffs motion for a preliminary injunction, holding that the Plaintiffs transfer within the Drug Enforcement Administration ("DEA") to another work assignment ~ if maintained ~ would lead to irreparable harm to members of a class of African American DEA agents. The Court noted that the Plaintiff had engaged in protected activity in the form of a class action discrimination suit against the employer, that the employee was subjected to adverse action in the form of a transfer to another work assignment, and that irreparable harm would attach to the

class members of the pending class action if the Court did not issue the injunction. Specifically, the Court wrote that:

[The Plaintiff's] unwarranted proposed removal, which the agency said they would implement unless the Court issues a TRO, would serve as an example to the class members: *"know your place, don't challenge management, don't assert your right to equal employment opportunity."* The message transmitted to the class members by this act of retaliation is clear; **unless Plaintiff is protected now from the adverse action, members of the class will refrain from coming forward with their claims. The injury to them will be irreparable,** (emphasis added). <u>Sesar v. Civiletti,</u> 515 F. Supp. 314, 320 (D.D.C. 1981). Like <u>Segar,</u> this matter requires Court protection lest members of the class in which Plaintiff is the Class Agent continue to refrain from actively participating in the litigation for fear of reprisal.

Plaintiff, who suffers from a disability, is the sole provider of her household. The Court's intervention is needed to preclude such irreparable harm such as the Plaintiff's ability; (a) to obtain requisite medical and psychological treatment; (b) to obtain prescribed medication (for refractory blood pressure and post traumatic stress disorder); (c) to meet financial obligations to sustain room and board and to preclude resulting in abject poverty; (d) to pay mortgage; (e) to sustain credit due to financial impairment due to loss of job; and (f) basic enjoyment of life.

3.    **There is No Possibility of Substantial Harm to the DoC or Any Other Interested Party from the Granting of Injunctive**

Under the four-part analysis, the Court must consider whether there is a possibility of

substantial harm to the DoC or any other interested party if the motion for preliminary injunction is granted. <u>Sega v. Civiletti, 516 F. Supp. 314 (D.D.C.) 1981.</u> Here the Plaintiff and the class of African American employees of DoC would continue to be substantially harmed if the preliminary injunction is not issued. **No harm would befall the DoC or any third party by the Court granting a preliminary injunction.** Defendant's counsel argues that it is in the public's best interest to terminate Plaintiff days before the Plaintiff's hearing before the court. Defendant's assertion is unseemly.  Plaintiff has served proficiently as an Export Compliance Specialist for 25 years.  Moreover, during the time, which the unwarranted and questionable removal is predicated upon, *Plaintiff has received a Bronze Medal Awards for Superior Service, a Time-Off Award, and a Merit Based Step Increase.* Plaintiff, due to her high competency was able to execute her job despite the fact that the Defendant denied her the most basic tools to affect her job – PC Laptop Internet Access. The public and DoC will be well served if the court grants Plaintiff's TRO.

In the case at bar, the plaintiff has met the burden of showing "extra-ordinary irreparable injury" under the standard set out by the Supreme Court in <u>Sampson v. Murray,</u> *supra,* as interpreted by this Court in <u>Bonds v. Heyman,</u> *supra,* by showing that the DoC's actions have already had a chilling effect on employees throughout the DoC and will likely continue to have such an effect.

**4.    The Public Interest Will Be Served By Issuance Of An Injunction In This Matter.**

The final determination that a Court must factor into the balance of interests is whether the public interest favors such relief. <u>Bonds v. Heyman,</u> 950 F.Supp. 1202, 1216 (D.D.C. 1997). Here, the public interest would greatly favor the granting of a preliminary injunction. The public

has an overriding interest in ensuring that any discrimination in its government agencies is redressed informally, when possible, and through Court action, when necessary. Moreover, the public's "overriding interest in preventing discrimination" justifies any inadvertent chill that judicial interference may cause. See Saunders v. George Washington University, 768F. Supp. 843, 846-87 (D.D.C. 1991), citing University of Pennsylvania v. EEOC. 493 U.S. 182, (1990). **The case at bar is extra-ordinary, in that no other Commerce employee or Cabinet level employee to the Plaintiff's knowledge has ever been isolated, targeted and earmarked in such a way to put them in the organization's budget entry, by name.  It is in the public interest that this matter is addressed by the Court in that DoC has continued to use public funds to perpetuate actions against the Plaintiff.**

## J.    DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED

### 1. Plaintiff Need Not Exhaust Administrative Remedies Before Bringing This Action

The Defendant erroneously contends that Plaintiff must exhaust her administrative remedies before bringing this action. The Court of Appeals for this Circuit has clearly held that the District Court has the power to grant interim injunctive relief in a civil rights case before Plaintiffs' exhaustion of administrative remedies. Wagner v. Taylor, 266 U.S. App. D.C. 402, 836 F.2d 566, 574-75 (D.C. Cir. 1987). The Wagner Court held:.

> [N]othing in the legislative history of Title VII evinces a congressional purpose to preclude a claimant from seeking interim injunctive relief. But the section-by-section analysis approved by the Conference Committee does stress the congressional perception of the importance of such relief to claimants with retaliation. . . . The need to ensure the integrity and effectiveness of Title VII proceedings becomes particularly compelling when claimants experience reprisals for asserting their rights. Retaliation threatens the very core of Title VII's guarantees, for it may well dissuade employees from ventilating their grievances.

Wagner, at 573-4.

The Wagner Court noted that the "indispensable role of interim injunctive relief in achieving the goals of Title VII" has been described well by the Second Circuit:

> We think it plain that for the court to renounce its incidental equity jurisdiction to stay such employer retaliation pending the EEOC's consideration would frustrate Congress's purposes. Unimpeded retaliation during the now-lengthy (180-day) conciliation period is likely to diminish the EEOC's ability to achieve conciliation. It is likely to have a chilling effect on the complainant's fellow employees who might otherwise desire to assert their equal rights, or to protest the employer's discriminatory acts, or to cooperate with the investigation of a discrimination charge."

Wagner, at 574 (citing Sheehan v. Purolator, 676 F.2d 877, 885-886 (2d Cir. 1982)).

In addition, "[i]n cases where an employee has sued an employer for discrimination, and retaliation against that employee occurs during the pendency of that suit, the Plaintiff will not be required to jump through administrative hoops before seeking an injunction." Bonds v. Heyman, 950 F.Supp. 1202,1208 (D.D.C. 1997).

Here, Plaintiff is not only part of such a discrimination suit against the DoC, but she is a high profile and active leader in the action. Additionally, where a Plaintiff files a complaint that "alleges discrimination and acts of reprisal for previous grievances lodged against the department, it is unnecessary for an employee to refile a new complaint upon every new instance." Bonds v. Heyman at 1208, citing Webb v. District of Columbia, 864 F.Supp. 175, 184 (D.D.C. 1994). A Plaintiff in this situation may, in fact, "raise the retaliation claim for the first time in Federal Court." Webb v. District of Columbia, supra, at 184 (citing Nelson v. Stone, 958 F.2d 584, 590 (4th Cir. 1992)). The D.C. Courts have recognized that to force an employee to return continuously to the administrative process for resolution of each new instance of

retaliation "may well invite an employer to take additional acts of reprisal, knowing the employee has no choice but to push more papers." Bonds v. Heyman, 950 F.Supp. 1202, 1208 (D.D.C. 1997). **It is important to note during a hearing before the Honorable Judge John Bates on January 26, 2007, the Defendant's counsel argued that Plaintiff was a – *"prolific filer."* Judge Bates informed Defendant's counsel that: *"One is not prohibited from filing complaints for subsequent alleged discrimination."*** Defendant's assertion that Plaintiff is a *"prolific violator of her civil rights"* and that Defendant's actions to remove her under *"the guise of poor performance"* is clearly being done to halt Plaintiff from exercising her Title VII rights.

### K.  PLAINTIFF HAS ALLEGED AN ADVERSE ACTION

Defendant correctly cites the standard for alleging an adverse action, but incorrectly applies that standard to the present matter. To meet the "adverse personnel action" requirement, the Plaintiff must show that she has suffer a material adverse employment action that involves tangible economic effect on Plaintiffs employment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth. 524 U.S. 742, 761 (1998).

The DoC proposed removal letter on February 21, 2008 entails both a significant change and benefits and significantly different responsibilities in her ability to make a living. Plaintiff, through an administrative error was placed on a questionable PIP, and issued a proposed letter of removal from a job and office she has served faithfully in for twenty five (25) years of government service. This change constitutes a materially adverse employment action that more than satisfy the adverse employment action criterion.

## L. **CONCLUSION**

Plaintiff's affiliations and activities relating to the civil rights of federal employees, discussed above, caused the DoC to single out Plaintiff and take adverse employment actions against her.    In retaliation against Plaintiff for her vocal opposition to racism and discrimination, and the active role she has played, and continues to play, in a pending race-based discrimination class action lawsuit against the DoC. The DoC purposefully and willfully created and allowed to foster a retaliatory environment such that Plaintiff has suffered significant psychological and physical harm.    Moreover, Plaintiff will continue to suffer immediate and irreparable injury and unabated continuation of the retaliatory actions if a preliminary injunction is not issued.  Given Plaintiff's likelihood of success on the merits, the extraordinary level of injury to her, and the Public interest, the issuance of the preliminary injunction is not only proper but is necessary in this case.

For the foregoing reasons, Plaintiff respectfully requests that this Court grant her motion for a preliminary injunction, and order the DoC to cease and desist all adverse employment actions taken against Plaintiff in retaliation against her because of her active role in defending for civil rights and her participation and leadership in a pending class action race-based discrimination suit against the DoC. Based on the foregoing, the Court should grant Plaintiff's request for a preliminary injunction.  A proposed order is attached.

Dated: April 4, 2008
          Washington, DC

                                      Respectfully submitted,

                                      *Janet Howard*
                                      Janet Howard
                                      Plaintiff Pro Se
                                      P.O. Box 1454
                                      Spotsylvania, VA 22553

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of April 2008, a true and correct copy of the above Plaintiff's Reply Brief in Support of Motion for a Preliminary Injunction and for an Expedited Hearing and Opposition to Defendant's Motion was hand delivered to the Defendant:

> Brian P. Hudak
> Assistant United States Attorney
> Civil Division
> 555 4th Street, N.W.
> Washington, DC 20530
> (202) 514-7143
> brian.hudak@usdoj.gov

Washington, DC
April 4, 2008

Respectfully submitted,

*Janet Howard*

Janet Howard
Plaintiff Pro Se
P.O. Box 1454
Spotsylvania, VA 22553
540-760-8478
janet_17771@netzero.net

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANET HOWARD<br><br>       Plaintiff,<br><br>       v.<br><br>CARLOS GUTIERREZ, SECRETARY<br>U.S. Department of Commerce, et al.<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No. 08-0421 (PLF)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PROPOSED ORDER

UPON CONSIDERATION of Plaintiff's Emergency Motion for a Temporary

Restraining Order and Preliminary Injunction, and the opposition thereto.  It is hereby:

ORDERED that Plaintiff's motion is, in all aspects, GRANTED.

SO ORDERED:


_____                           _____
Date                                                                    PAUL L. FRIEDMAN
                                                                           United States District Judge

# EXHIBIT 1

**OFFICE OF THE SECRETARY
ADVANCES & REIMBURSEMENTS
PROJECT DESCRIPTIONS
(JANET HOWARD CLASS ACTION FUND)**

**2001**



# GENERAL COUNSEL

## PROJECT 7030000 - EXECUTIVE SUPPORT

**DESCRIPTION OF SERVICE:**  This office was established by senior DOC officials to handle the Department's overall relationship with the Intelligence Community and senior Community officials.

The office provides all-source intelligence support to the Secretary and other senior level DOC decision makers in the development and implementation of Department programs, policies, and activities.

**BASIS OF CHARGE - AUTOMATIC MONTHLY:** Workload for each bureau determined by the Executive Support office director based on historical and projected services used.


## PROJECT 7031000 - CLASS ACTION SUIT  (Initiated in FY-2001)

**DESCRIPTION OF SERVICE**:  The Employment and Labor Law Division, Office of the Assistant General Counsel for Administration, is responsible for providing legal representation on behalf of the Department in the conduct of the class action litigation, Janet Howard v. Donald Evans, Secretary, Department of Commerce, Agency No. 95-67-0198.  The class action involves employees from all operating units of the Department, and the Division provides advice and representation on this matter across organizational lines.

**BASIS OF CHARGE - AUTOMATIC MONTHLY:**  Each bureau's share of the total enacted FTE as shown for FY 2000 in the Departmental Congressional Request for FY 2001.

# EXHIBIT 2

**JANET HOWARD'S
TIMELINE OF EVENTS**

**Janet Howard's Time Line of Events**

| | |
|---|---|
| 1/17/07 | Tom requested narrative in support of ***Bronze Medal Award***.<br><br>E-MAIL from Tom to Janet @12:53 PM- Janet, The rep. in HR returned my recommendation for you all to receive 8 hours off for your contributions to BIS that was supported by the awarding of the Bronze Award to each of you and said that more supporting narrative of the accomplishments was needed to justify the 8 hour time off award… |
| 1/17/07 | Tom's response to narrative in support of Bronze Medal Award.<br><br>E-MAIL from Tom to Janet @3:11 PM-Janet-, Thanks much for this info- there is some good stuff in here to draw on.  Thanks.  The one thing I don't know or recall – do you have the approx. dates or time your committee involvement was for?  Like 3 months?  More? Was told that is helpful as well. Tks. Tom. |
| 1/17/07 | Tom's response to more narrative in support of Bronze medal award.<br><br>E-MAIL from Janet to Tom @ 3:28pm- Tom, I need to check with Gay (BIS ADM. OFFICER), but I think it was longer.  From the beginning to implementation, probably 5 or 6 months.  As I said, I can't be exactly sure.  Gay knows the exact time. |
| 1/17/07 | Tom agreeing on length of time he will submit for Bronze Medal Award.<br><br>E_MAIL from Tom To Janet @4:46PM- Janet- that's fine for this purpose, thanks.  I'm going to go with approx. a ½ year. |
| 1/17/07 | Awarded " **Bronze Medal Award**" *for Superior Federal Service* |
| 1/21/07 | Awarded " **Within grade increase**" Remarked: ***"work performance is at acceptable level of competence"*** |
| 1/21/07 | Recipient of  ***"Time off award"*** |
| 2/1/07 | Four (4) working days later First Line Supervisor Tom Andrukonis held progress review to address *performance con*cerns |
| 2/8/07 | Janet request participation in the "***Volunteer Leave Donor Program***".<br><br> E-MAIL from Janet to Tom- Good morning Tom, I am in receipt of your response |

| | from the Office of Civil rights regarding my participation in the Volunteer Leave Donor Program. The repost says you did not deny my request to participate in the Volunteer Leave Donor Program. Based on your statement, what is the current status of my leave donor program request? Janet |
|---|---|
| 2/8/07 | Volunteer Leave Donor Program response from Tom. E-MAIL FROM TOM TO JANET- Janet, I don't know think they provided you all my responses then, because as I replied, I met with you immediately following receipt of the additional form (wh-380) that HR stated must be submitted with your application. They gave me a copy of this form and the web site information from the process to follow. I hand delivered this form wh-380 to you in my office and the instructions and I gave you this and your other paperwork to have completed and submit back. Have your treating physician assist in completing form wh-380 and submit the required documentation so it can be processed. If you don't have the form wh-380 anymore I'll be glad to get you another one – Tom. |
| 2/9/07 | Janet's response to Tom-Re: Volunteer Leave Donor Program. E-MAIL FROM JANET TO TOM – Tom, the form you gave me in your office was a form for FMLA. I did not apply for FIMLA. FMLA and volunteer leave donor are two different programs (see opm web cite). My doctor had already completed the necessary information requested on the leave donor application. The leave donor program instruction requires only one action from you and that is to obtain your signature, which was not on the completed leave donor application package. |
| 2/9/07 | ***Other BIS Managers privy*** to ***Janet's Private Leave donor information***. The E-Mails transmitted on 2/9/07 from Janet to Tom were forwarded un-be-known to Janet to the following BIS employees:  Dawnelle Battle, Elaine Farrow, Eileen Albanese, Elizabeth Rosenkranz, Jeannette Chair, John Mckenna, Matthew Borman, and William Arvin. Because William was out of the office, he left an out of the office response to any email transmission directed to his email address. ***On 2/9/07 @ 8:37:49 M, SUBJECT:  LEAVE DONOR PROGRAM (ARVIN OUT ULTIL FEB 9).  I WILL BE OUT OF THE OFFICE UNTIL FEBRUARY 9.  I WILL HAVE ONLY LIMITED ACESS TO THIS E-MAIL ACCOUNT WHILE I AM OUT….*** |
| On or About 2/15/07 | ***Whistle blower to the Office of Special Counsel- alleging reprisal for whistleblowing.*** |

| 3/14/07 | Respt... from U.S. Office of Special counsel... #010753. |
|---|---|
| 3/22/07 | **"PIP Conspiracy by BIS deputy/OGC/Tom."** |
| | E-mail from *Wendy Wysong (BIS DEPUTY ASSISTANT SECRETARY) to Tom and Allison J. Boyle (Office of General Counsel, Employment & Labor Division.)* |
| | *8:08 a.m* How is the **PIP** coming" I would like to get it in place tomorrow. It's been pending for some months and we need to get it in place. I'm sure Kim **(Lead Attorney for class action –Janet Howard, et.al vs Carlos Gutierrez)** will take the message back, and you sent your note to the right person with good timing." |
| | That said, there will be a mid-term meeting in early April with all and the numbers will be referenced again for all folks… |
| 3/22/07 | More PIP Conspiracy from Tom/Wendy/Kim Hartwell. |
| | E-mail from Tom Andrukonis to Wendy Wysong– |
| | 9:15 a.m. FYI-I met with Kim Hartwell (Lead attorney for the class action-Janet Howard, et al vs Carlos); yesterday for an hour other related questions on the **"Summary Motion"** {Class action} factual something or other and I mentioned the PIP and its' status with them and there clearance. |
| 3/22/07 | PIP Conspiracy continues by Wendy/Tom. |
| | E-mail from Wendy to Tom |
| | 9: 18 a.m. - *Umm, so what was the bottom line?* __*When are we getting it back from them so it can be put in place*__*….we can't treat her differently from **others** and I'm a little worried that the delay could be seen that way.* |
| 3/22/07 | *PIP Conspiracy embraced by BIS Deputy Assistant/OGC.* |
| | E-MAIL TO WENDY WYSONG FROM ALLISON J. BOYLE (U.S. DEPARTMENT OF COMMERCE OFFICE OF GENERAL COUNSEL EMPLOYMENT & LABOR LAW DIVISION) |
| | 10:47 AM- |

| | When we received the revised version last week, we have reviewed and made some minor changes. It is being reviewed by one other attorney in our office, and we should have all our changes to you by COB today. |
|---|---|
| 3/22/07 | PIP conspiracy Finally via Tom/OGC. <br><br> E-MAIL FROM TOM ANDRUKONIS TO ALLISON J. BOYLE (U.S. DEPT OF COMMERCE OFFICE OF GENERAL COUNSEL EMPLOYMENT & LABOR DIVISION) <br><br> 2:40:09 pm |
| 3/27/07 | Placed on a 90 day PIP- Witnessed by Roberto Lopez, OHRM. |
| 3/27/07 | Transported via ambulance and *admitted* to George Washington Univ.hospital. |
| 4/27/07 | 90 day PIP. (Restarted) |
| 5/1/07 | Sending items related to *Operational Support Division* to Norma. <br><br> EMAIL from Tom to OEA – Subject: Work Items and Transition. - For All- in an effort to try to make as smooth a transition as possible, I am working closely with Norma on items relative to the Operational Support Division so that she is knowledgeable about the various different types of tasks there. Please start today sending items related to that division to Norma for action that you would have previously sent to me for decision or queries. I'll still be here, but that way I won't accidentally or quickly respond to things without making sure Norma is completely plugged in and knows the drills. On the Intelligence Analysis Division side, please go direct to Elizabeth for leads, field support work activities, etc. Elizabeth can raise with me any items that she needs to as well. |
| 5/2/07 | Janet Missed a staff meeting. <br><br> E-MAIL FROM TOM TO JANET @ 8:17 AM- Note: Janet was verbally reprimanded by Tom for not attending a staff meeting because of multiple email transmission from a number of OEA analyst seeking clarity on the date she was confused about the exact date. Janet- thanks for the note. Norma sent out to all the above-attached email |

| | |
|---|---|
| 5/2/07 | Janet's response to missing staff meeting.<br><br>EMAIL FROM JANET TO TOM @ 12:59PM- Tom, Just to follow up on your comments to me concerning yesterday's meeting. I have been informed by OEA employees in attendance at the meeting on yesterday that before the meeting began; you noticed that Dorcas and Louise were not in the meeting room. I was told that you left the meeting and went to look for them. It's worth noting that both Dorcas and Louise are located in the main office while I am physically located on the other end of the building. It's interesting that two things didn't occur to you. (1) To ask where was I and, (2) ask someone to pick up the telephone and call me. Neither action required any of the effort you extended in looking for Dorcas and Louise. Also, Dorcas and Louise received the same (attached) email from Norma that you so graciously sent to me. Although we were all *similarly situated*. I was *treated differently* by you than they. Janet |
| 5/2/07 | PIP placement *disqualifies Janet from applying for GS-13*.<br><br>E-MAIL from Janet to S. Thomas (office of civil rights) requesting to amend Complaint number 07-67-00010. Tom disqualified Janet as a candidate from applying for the two 1801-gs-13 Export Compliance Specialist/Analyst position located in OEA by placing her on a PIP. This is a continuation of the retaliation against Janet for filing the February 22, 1995 Class Action complaint. Absent of being placed on a PIP, Janet meet all of the necessary requirements for applying and competing for the advertised positions. |
| 5/02/07 | Re-affirmed that Tom would review and act on my entire work product. |
| 5/5/07 | *Progress review* from Tom.<br>Progress review bearing Tom's initials, box checked- review indicated performance is at level 5 or higher on all critical elements. |
| 5/8/07 | Filed Freedom of Information act requesting total number of BIS employees on a PIP. |
| 5/8/07 | Amended Complaint to include placement on PIP.<br><br>EMAIL From S. Thomas (office of civil rights) to Janet- Amended Complaint Number 07-67-00010 to include allegation concerning placement on a Performance Improvement Plan (PIP) |

| | |
|---|---|
| | Email Tom relaying EEO Sizemore's concern as to who would have periodic review and meeting with me while on the PIP. |
| 5/14/07 | Confirmation of Janet's Periodic review. |
| | Emailed Tom and cc'ed Sizemore asking if he would still be responsible for meeting periodic review of my progress while on the PIP. |
| 5/22/2007 | R. Lopez (OHRM) sends e-mail to C. Sizemore EEO investigator Subject: document Request |
| | *"The OHRM employee and labor relations does not have any record or information regarding any employee from OEA being placed on a Performance Improvement Plan as stated in your request above."* |
| 5/23/07 | Tom no longer supervisor; TODD becomes new supervisor |
| 5/27/07 | PIP ENDS |
| 7/27/07 | Memorandum of Understanding to Glenn Krizay and Todd Willis.    Subject: Performance Improvement Plan (PIP) Status. |
| 5/30/07 | *2 month PIP preview* by Tom. |
| | **Email from Tom to me entitled** - Mtg today-recap. Meeting today with **JANET – Jan, thanks for meeting today on your work over the last month.  As we discussed, I've asked Markita to pull all copies of outgoing PSV cables to confirm the exact number initiated and will let you know on that.  You have 2 PLCs over the last month which is ahead of the pace of 15 a year, and you had 32 screen actions which is three times the pace required of 10 a month.  So overall, things look good in all areas but as we discussed we need to focus now on getting some NLR PSVs so we can hit the required 10-15 for the year.  Thanks much for all your work and I'll get back with you on the PSV number – Tom.** |
| 6/11/07 | FOIA response. |
| | Received FOIA response to Linda Bell from OHRM Officer Roberto Lopez |
| | *"There are no records of any employee in BIS being on a PIP."* |
| 6/15/07 | BIS Broadcast from Darryl Jackson. |
| | E-MAIL from Darryl Jackson to BIS USERS- Subject:  Jonathan Carson- Interim OEA |

Director by a happy coincidence, Jonathan Carson, the assistant special agent in charge of our New York field office, has agreed to serve as the interim Director for the Office of Enforcement Analysis, pending the appointment of a permanent Director.   Jonathan will begin his new duties on Monday June 11, and we anticipate that the permanent director will be on board in the next few months. Jonathan is currently here in Washington, D.C. helping with various matters resulting from vacancies at OEE headquarters.   We are very fortunate that he has agreed to become the interim OEA director.   His OEE/NYFO experiences will help foster continued interaction between OEE and OEA.   Before current OEA director Tom Andrukonis moves to his new position in EA, he has graciously agreed to continue providing valuable transition guidance to OEA's new leadership.   We thank Jonathan and Tom for their contributions and service as we continue with the OEA reorganization.

| | |
|---|---|
| 6/29/07 | Freedom of Information Act Appeal. |
| 7/3/07 | Tom's last day.<br><br>E-MAIL from Jonathan Carson- Subject:  Tom's last day in OEA. Message:  There are some cookies and other stuff in my area in honor of Tom!! Please come by for some!! |
| 7/9/07 | Tom is in OEA.<br>E_MAIL FROM TOM TO JANET- I am now down in EA in my new position so you should contact Jonathan direct from now on re: leave and work matters – Tom. |
| 7/25/07 | Emailed Wendy Wysong, Tom and cc'ed Sizemore for (March 27, 2007) PIP Status. |
| 7/27/07 | Memorandum of Understanding after meeting Glenn and Todd re: PIP status |
| 7/27/07 | Janet's interrogatory request by Glenn.<br><br>E-Mail from Glenn To Janet after asking Janet for copies of her interrogatories and responses - in to the eeo complaint she filed for being placed on the 2007 PIP by Tom Andrukonis. Message: Janet, Thank you for the additional info.  I may be missing it but I also wanted to see the document that you ref'ed in our meeting that Ms Sizemore stated that Tom was the only one that could review your work.  Would you please send that to me?  If it is in the documents that you sent please tell me the page. Thx. Glenn |
| 7/27/07 | Charla Sizemore E-Mail.<br> E-Mail from Janet to Charla Sizemore (OCR). Mrs. Sizemore, there has been a change of managers in the Office of Enforcement Analysis. The office Director Thomas |

...Andrukonis has been replaced with Charla Sizemore my Rage 8 of visor is Todd Willis. Since being placed March 27, 2007 on a 90 day PIP by Thomas Andrukonis who has since been moved to Export Administration (EA) down on the second floor. I needed to know my PIP status. I met on Friday at 8:00 am (July 27, 2007 with Mr. Krizay and Mr. Willis in an effort to find out how much was shared with them about the PIP. I shared with them an email I sent to you. Wendy and Tom for a status report of my PIP. I told them that in OCR I am shown as having my work reviewed and monitored by Tom. Tom then delegated this responsibility to Jonathan Carson. OEA's organization shows me reporting to Todd Willis. I needed to know who the responsible party is. My concern is that I gave Mr. Krizay EEO documents he should not have been privy too. I apologize for not checking with you first before complying with his request to release these documents. I have since received guidance and it seems that Mr. Krizay should never have requested this information. Was it appropriate for Mr. Krizay to request the attached documents? Now that he is in possession of this information how does it impact him? Attached, please see the following documents I provided to Mr. Krizay: (1) First set of interrogatories and answers; (2) Second set of Interrogatories and answers; (3) Status letter to Wendy Wysong and Thomas Andrukonis and Carbon copy to Charla Sizemore. I also shared a FOIA request document and response from Roberto Lopez (OHRM) stating that there was no record of any BIS employee being placed on a PIP. The meeting concluded by Mr. Krizay saying that he would look at all the documentation which supported me being placed on a PIP and the would make a decision and render a report. Do note Mr. Krizay reported on duty July 23, 2007. My PIP was to end July 27, 2007. As mention in our previous conversation, during Tom's transition, he had asked Jonathan Carson interim office director to review my work. During the 90 day, I received one review from Tom. I never met with Jonathan and, I never discussed any part or portion of the PIP, To date, I have not received any documentation of my PIP status.

| 8/17/07 | Janet request Additional Accommodation request for internet access accommodation. |
|---------|-----------------------------------------------------------------------------------|
|         | E-MAIL FROM JANET TO TODD WILLIS- RE: ADDITIONAL ACCOMMODATION REQUEST 10:12 AM    |
|         | Good morning Todd, This email serves as a formal request for Additional Accommodation of internet access, either via my desktop computer or, by way of a Laptop computer because of limited mobility. I have contacted my attending physician for a letter in support of my requested for additional accommodation. |

| | |
|---|---|
| | **E-MAIL FROM TODD TO JANET @ 11:17 AM**<br><br>Janet, I confirm receiving your request and note that you and I have also discussed this matter in a one-on-one both this week and last week. Thank you. Todd. |
| 10/01/07 | FY 08 Performance Appraisal Begins. |
| 11/13/07 | Placed on PIP to cover Nov. 13, 2007- Jan. 11, 2008, witnessed by Elizabeth Rosenkranz. |
| 11/13/07 | Todd does not know the ***standards for conducting EUCs***.<br><br>E-mail from Todd to Jay regarding Janet Howard Placed on PIP to cover Nov. 13, 2007- Jan. 11, 2008- Message: Subject ***Confidential \*\*confidential\*\*; Jay, Starting today Tuesday, 11/13, I would like for you and I to review Janet's checks together. First to ensure that I am applying consistency in the standard for conducting EUCs and second I will be working closely with her over the next 60 –days to improve her work. Let's discuss the best way to accomplish this and not slow down our processing times. I appreciate your help. Todd.*** |
| 11/27/07 | Janet's justification does not meet the ***standards***.<br><br>In all, your justification memo is deficient because it does not meet the standards stated in the PIP. Please note that under the PIP, if you submit two or more deficient justification memos, you will ***fail*** this Critical Element and the PIP. |
| 12/14/07 | Freedom of Information Request. Performance award date, Time off award, Quality step increase award, cash in a flash award and any other types of awards distributed to all employees in the Office of Enforcement Analysis (OEA) |
| 1/8/08 | Attorney letter- ***Upsurge in harassment to Janet.*** |
| 2/20/08 | Jay was promoted to ***GS-14 OEA Chief.*** |
| 2/27/08 | Notice of Proposed Removal |
| 3/11/08 | Filed in U.S. District Court- ***"Motion for Temporary Restraining Order (TRO) and Preliminary Injunction and a Motion to Dismiss".*** |
| 3/27/08 | ***"Verbal and Written Response in Opposition to Proposed Removal"*** before Glenn Krizay, Dir. OEA. |
| 3/27/08 | ***Received a courtesy email copy from Defendant's Counsel Brian Hudak, Defendant's Brief in Opposition of Motion for Preliminary Injunction (Summary Judgment).*** |
| 4/4/08 | ***Submitted the Plaintiff's Reply Brief In Support of Motion for a Preliminary Injunction and for an Expedited Hearing, and Opposition to Defendant's Motion to Dismiss to Defendant's Counsel Brian P. Hudak, Assistant United States Attorney, Civil Division, 555 4th Street, N.W. , Washington, DC 20530.*** |
| 4/7/08 | Plaintiff Reply Brief In ***"Support of Motion For Preliminary Injunction and For an Expedited Hearing and Opposition to Defendant's Motion to Dismiss."*** |
| 4/9/08 | Pre Trial for ***ADA*** before Judge Paul Friedman. |
| 4/9/08 | Hearing before Judge Paul Friedman ***"In Support of Motion For Preliminary Injunction and For an*** |

# EXHIBIT 3

**JANET HOWARD'S
PERFORMANCE IMPROVEMENT PLAN
(PIP)**

**UNITED STATES DEPARTMENT OF COMMERCE**
Bureau of Industry and Security
Washington, D.C. 20230

November 13, 2007

Memorandum for:    Janet Howard
                   Export Compliance Specialist
                   Operations Support Division
                   Office of Enforcement Analysis

From:              Todd Willis
                   Assistant Director
                   Office of Enforcement Analysis

Subject:           Performance Improvement Plan

This memorandum is to notify you that you are not meeting the performance standards of your Export Compliance Specialist, GS-1801-12, position because your performance has fallen to an unsatisfactory level (Level 1) in three Critical Elements. Your unsatisfactory performance has adversely affected the efficiency of the service and cannot continue. Consequently, I am providing you with a Performance Improvement Plan (PIP) to allow you an opportunity to raise your performance to the satisfactory level (Level 2). This memorandum identifies your performance deficiencies and outlines the steps you will need to take under the PIP to raise your performance level to Level 2. The PIP will become effective on November 13, 2007, and will continue for 60 days, ending on January 11, 2008.

I.    **Background**

At the end of the Fiscal Year (FY) 2006 rating period, you received a Level 2 rating and were notified of concerns with your performance, particularly with regard to Post-Shipment Verifications (PSVs) and Review of Shipper's Export Declarations. During your FY 2007 progress review conducted on February 1, 2007, your then-supervisor, Tom Andrukonis, discussed with you his concerns that your performance problems persisted.

By memorandum dated March 27, 2007, Mr. Andrukonis determined that your performance had fallen to an unacceptable level and he notified you of his decision to place you on a 40-day Performance Improvement Plan (PIP) to assist you in raising your performance. The PIP memorandum detailed your performance deficiencies and the steps you would need to take to raise your performance to an acceptable level. Shortly thereafter, you took 30 days of leave, which postponed the PIP's implementation until April 27, 2007, when you returned.

As a result of personnel changes within our office, I was your third first-level supervisor during the course of your PIP. I became your supervisor on July 23, 2007 and was able, for only a few days, to observe first-hand your performance under the PIP. While you did improve in some areas, such as customer service, you did not pass the entire PIP. However, I am determined to



provide you every opportunity to improve your performance. Toward that end, I have rated your performance unsatisfactory for FY 2007 and am issuing you a revised PIP. This PIP allows you further opportunity to raise your performance level while also allowing me the opportunity to evaluate fully and first-hand your performance. Your performance deficiencies are set out below, as are the steps you will need to take to raise your performance. The PIP becomes effective November 13, 2007 and will last 60 days, until January 11, 2008.

## II.   Performance Deficiencies

As an Export Compliance Specialist, you are responsible for evaluating export transactions. Your duties include, among others, adding and deleting parties of concern to the Watch List maintained in BIS's database. You are assigned 41 countries and your duties are correlated to export transactions with entities in those 41 countries. Among your assigned countries is the United Arab Emerites (UAE). Export transactions to certain countries, including the UAE, are of highest priority to BIS. The UAE is your highest priority country. The Agency employs BIS Special agents in these priority countries as Export Control Officers (ECOs) who, along with other duties, conduct end-use checks.

As an Export Compliance Specialist, your duties include identifying entities of interest and referring them to the ECO to conduct an appropriate end-use check. End-use checks involve in-country reviews and verifications, also known as pre-license checks (PLCs) and post-shipment verifications (PSVs).[1] After completing these reviews and verifications, the ECOs report relevant information back to the Export Compliance Specialist. Based upon the information received from the ECO, it is your responsibility to make final determinations and appropriate recommendations, and to take proper actions on exports transactions under your review. In that respect, you must effectively communicate and coordinate with all officials conducting in-country reviews/verifications, particularly the ECO assigned to the UAE.

### A.   Critical Element 2: Export License Applications Review and Pre-License Checks

Under this Critical Element, your responsibilities include, among others, reviewing export license applications and initiating pre-license checks. There are seven major activities in this Critical Element, and you failed to perform at the acceptable level in (Level 2) in one of these activities.[2] This activity is of such significance, that unacceptable performance in the activity constitutes unacceptable performance for the entire Critical Element.

Your fundamental job duties require you to initiate appropriate and sufficient pre-license checks

---

[1] When there is no ECO employed in-country, BIS will send an appropriate official abroad to conduct the necessary review and verification.

[2] This activity is: appropriate and sufficient quality pre-license checks initiated to ensure adequate coverage of sensitive items and countries.

2

(PLCs). These duties include screening export license applications for countries assigned to you and determining whether to refer an application for a pre-license check (PLC). Your determinations should be based on several factors such as, but not limited to, whether the entity is known/unknown, the quantities of items to be exported, the product at issue and the dollar amounts. Your referrals initiate the PLC process, but the actual check is performed in-country and occurs *before* the exports are licensed and shipped.

To be fully successful, you must have initiated at least 15 PLCs. During the rating period, you initiated only nine (9) PLCs. The 9 you initiated fall far short of this metric and constitute unacceptable performance. In addition, of the 9 PLCs you initiated, eight (8) were untimely. In fact, these 8 recommendations were made between 10 and 69 days after BIS's receipt of the application. Thus, your average for initiating PLCs, was 28-days. This is unacceptable because you are required to make your license recommendations in an average of six calendar days.

Finally, of the 9 PLCs you initiated during the rating period, 6 – or 67% – were identified for end-use check by other agencies through the interagency review process.[3] Thus, only 3 of the PLCs were based on your independent review, research and analysis. Indeed, I have significant concerns about the quality of your review of license applications for referral for PLC. For the period April 27, 2007 and July 27, 2007, you received approximately 136 license applications for the UAE. After sampling 70 of those applications, I discovered that 10 were unknown entities and you had not referred any for PLC. This failure to refer unknown entities – particularly for the UAE – raises serious issues about the quality and attention you devoted to the license applications you reviewed. For all of these reasons, I find your performance under this Critical Element unacceptable.

    B.    <u>Critical Element 3: Post-Shipment Verifications and Review of Shipper's Export Declarations</u>

Under this Critical Element, your responsibilities include, among others, initiating post-shipment verifications (PSVs) and reviewing shipper export declarations. PSVs help the U.S. Government ensure that exported items are being used in accordance with U.S. export control regulations and the terms of the export license. There are six major activities in this Critical Element, and you have failed to perform at the acceptable in level in one of those activities.[4] This activity is of such significance, that unacceptable performance in the activity will result in unacceptable

---

[3] The interagency process is the review of export license applications conducted by federal authorizing agencies, including the Departments of Defense, State and Energy. Each of these agencies reviews license applications according to their own missions and priorities. This review includes identifying items and/or parties to the export transaction that are of concern. The agencies make recommendations for each export transaction through the licensing process.

[4] This activity is: appropriate and sufficient quality post-shipment verification are initiated from BIS licenses and from unlicensed exports (e.g., NLR, GBS etc.) to ensure adequate coverage of sensitive items and countries.

performance for the entire Critical Element.

One of your fundamental job duties requires you to initiate PSVs from BIS licensed and unlicensed exports. Toward that end, you must generate a cable to the official in-country responsible for conducting the end-use check. The cable must detail all relevant information about the export transaction so that the in-country official may take appropriate action.

During the rating period, you did not initiate an appropriate quantity of PSVs from BIS licensed and unlicensed exports. To be fully successful, you needed to initiate at least 35 PSVs, 10 to 15 of which had to be initiated from exports made **not** under a validated BIS license. Although you initiated 11 PSVs for exports not under a BIS license, you only initiated a total of 18 PSVs. This is far lower than the fully successful level, so much so that it constitutes unacceptable performance. Notably, of the remaining 7 PSVs you referred for licensed items, 6 – or nearly 86% – were the result not of your independent review, research and analysis, but instead were identified to you during the interagency process. For all of these reasons, your performance under this Critical Element is unacceptable.

I also note serious concerns about the quality of your referral cables for PSV. Cables you submitted to me as final were regularly inaccurate, unclear, incomplete and/or untimely and required major corrections and/or revisions. I have had to return cables to you for correction, and you have failed to make those corrections or did not make them in a timely fashion. As a result of your inaction on such cables, the PSVs remain uninitiated.

    C.    <u>Critical Element 4: Research and Analysis of Assigned Export Enforcement Projects</u>

Under this Critical Element, your responsibilities include, among others, researching and analyzing export enforcement projects assigned to you. There are six major activities in this Critical Element, and you failed to perform at the acceptable level in (Level 2) in one of those activities.[5] This activity is of such significance that unacceptable performance in the activity constitutes unacceptable performance for the entire Critical Element.

You were required under this Critical Element to research, gather and analyze export controls information from available resources. In addition, you were to monitor closely the geographic areas assigned to you and to gather, analyze and maintain information on weapons of mass destruction programs, transshipment points, terrorism and proliferation issues on assigned countries of concern. However, you failed to do so and instead relied too heavily upon the interagency process.

---

[5] This activity is: innovative suggestions are made to improve long-term and short-term effectiveness of export control system. Assigned geographic areas are closely monitored; information is gathered, analyzed and maintained on weapons of mass destruction programs, transshipment points, terrorism and proliferation issues on assigned countries of concern to enhance the quality of end-use checks initiated.

During the rating period, you initiated 27 end-use checks, but only 15 were based on your own analysis of research you conducted. The remaining 12 – or 44 % – were identified to you during the interagency process. This is unacceptable performance of your research and analysis duties.

Given the performance deficiencies described above, it is necessary to place you on a 60-day PIP to raise your performance to an acceptable level (Level 2).

## III.     Performance Improvement Plan

Below I have outlined the particular duties you must perform relative to each Critical Element to raise your level of performance to an acceptable level (Level 2).

### A.     Critical Elements 2:  Export License Applications Review and Pre-License Checks

To raise your performance to the acceptable level, you must review each export license application for possible pre-license checks (PLC), with particular attention on your priority country, the UAE. In connection with this duty, you must maintain a weekly log for all license applications for the UAE. This log must show the date you receive the application; the date you review the application; whether the party is known/unknown, the recommendations you make for the application; and the date you make your recommendation. A sample log is attached to this PIP and is available for you in electronic copy as well. Failure to review license applications or maintain the weekly logs as described above three or more times will result in unacceptable performance.

To perform at the acceptable level under this PIP, you must also refer a total of at least three (3) PLCs. Of those three PLCs, at least two (2) must be for the UAE and at least one (1) must be for one your remaining countries. Only those PLCs that you identify through independent research and analysis will count towards this total. Other recommendations, such as through the interagency process or by the licensing officer, will not count towards this total. Your PLC referrals must be timely, that is, within at least 3 business days of BIS's receipt of the license application. Failure to meet these metrics or issue timely PLC referrals two (2) or more times will result in unacceptable performance.

### B.     Critical Elements 3:  Post-Shipment Verifications and Review of Shipper's Export Declarations

To raise your performance to the acceptable level, you must initiate at least five (5) total PSVs. Although your first priority for these PSVs must be the UAE, you should initiate PSVs for a variety of your countries so that you do not overload the UAE ECO. Of the five PSVs you initiate, two (2) must be no-license required (NLR) checks and the remaining three (3) must be licensed PSVs. At least three (3) of the five PSVs must be for the UAE.

Only those PSVs that you identify through independent research and analysis will count towards these totals. Recommendations for PSVs made through other means, such as the interagency

process or by the licensing officer, will not count towards your totals.

C.    Critical Element 4:  Research and Analysis of Assigned Export Enforcement
      Projects

As set out above for Critical Elements 2 and 3, you must refer sufficient, quality PLCs and
PSVs. With respect to your referrals, they must be selected after thoughtful research and
analysis. Your reasons for the referrals, including the research and analysis you conducted, must
be fully presented to me in a brief 1-2 paragraph memo. I must receive each justification memo
before you initiate the PLC or PSV. Your justification memos must contain few to no spelling
or grammar errors. The memos must be comprehensive and organized appropriately. These
memos need not be formal, but rather can be transmitted via email. I have attached a sample
justification memo/email as guidance. Failure to follow these standards two (2) or more times
will result in unacceptable performance.

Effective November 12, 2007, you have a 60-day period in which to demonstrate acceptable
performance in Critical Elements 2, 3, and 4. Failure to meet any of the standards outlined
above will constitute failure of your Performance Improvement Plan, resulting in a Level
1/Unacceptable Performance rating. During this 60-day period, I will carefully monitor your
performance to determine if you are performing in accordance with the standards listed above. I
will also meet with you periodically during the PIP period to provide you feedback and guidance
as needed. At the end of the 60-day period, if your performance is unacceptable in any one of
the Critical Elements identified above, I will determine that your performance continues to be
below the acceptable level and I will initiate the appropriate performance-based action, which
may include removing you from your position and the Federal service.

If your performance is acceptable at the end of the 60-day period, you must maintain this
acceptable level of performance for a period of twelve months from the date this PIP is initiated.
Failure to do so will result in unacceptable performance (Level 1) and may form the basis of a
performance-based action to demote you or remove you from your position and the Federal
service without providing you an additional performance improvement period.

If you believe that you have a medical condition that prevents you from performing the duties of
your position at an acceptable level and you wish me to consider reasonable accommodation,
you must provide to me a written request in accordance with Department Administrative Order
(DAO) 215-10, Reasonable Accommodation for Disabilities in Employment. You must provide
me with (a) medical documentation of your condition, (b) the effect of this condition on your
work, and (c) specific actions that I could take to assist you in performing at Level 2. Any
accommodation requested will be carefully reviewed to determine if it can be implemented
without undue hardship to the agency or risk to you or others. If necessary, I may request the
assistance of the Department's Medical Officer in evaluating any medical documentation that
you submit. To receive full consideration, documentation of any medical condition should be
received no later than thirty (30) calendar days from your receipt of this notice.

If you feel that you have a personal or medical problem that may be impeding your ability to perform your duties at Level 2, you may want to consider seeking assistance through the Employee Assistance Program (EAP). This is a confidential program, and you may reach a counselor by calling 202-482-1569 to schedule an appointment.

I hope you will use these suggestions, as well as the assistance we are providing to you, to improve your performance to Level 2 during the performance improvement plan.

If you have any questions concerning the contents of this notice, the performance standards involved, or my expectations of you now or at any time, please see me immediately. If you have any questions about this performance improvement plan or require additional guidance on implementing the provisions of it, please let me know as soon as questions arise. Keep in mind that it is important to refer to this plan throughout the performance improvement plan period.

Please sign and date the receipt acknowledgment copy of this memorandum. Your signature merely indicates that you have received a copy of this memorandum; it does not indicate that you agree or disagree with its contents. However, your refusal to sign the receipt acknowledgment copy does not nullify the effect of this memorandum; i.e., placing you on a performance improvement plan for 60 calendar days.

RECEIPT ACKNOWLEDGED:

_Employee Refusal to Sign_
Employee

_[signature]_  11/3/07

Date of Receipt

7

# EXHIBIT 4

**JANET HOWARD'S
PROPOSED REMOVAL LETTER**



**UNITED STATES DEPARTMENT OF COMMERCE**
**Bureau of Industry and Security**
Washington, D.C. 20230

February 27, 2008

Memorandum for:   Janet Howard
                  Export Compliance Specialist
                  Operations Support Division
                  Office of Enforcement Analysis

From:             Todd Willis
                  Assistant Director
                  Office of Enforcement Analysis

Subject:          <u>Notice of Proposed Removal</u>

This memorandum serves as official notice that I propose to remove you from your position as an Export Compliance Specialist, GS-1801-12, Office of Enforcement Analysis (OEA), Bureau of Industry and Security (BIS), U.S. Department of Commerce (DOC) and the Federal Service effective no earlier than thirty (30) days from your receipt of this notice.  I am proposing your removal for unacceptable performance and to promote the efficiency of the Service, in accordance with Title 5 of the Code of Federal Regulations, Chapter 43.

**Background**

The Office of Export Analysis' mission is to carry out the Agency's export enforcement responsibilities as mandated by the Export Administration Act of 1979 (the Act) and its implementing regulations.  These responsibilities include:  developing and implementing enforcement policy; collecting, analyzing and evaluating intelligence about illegal diversions of U.S. origin commodities and technology; identifying and investigating allegations of violations of national security and foreign policy controls; coordinating intelligence and enforcement activities of the U.S. and foreign governments; liaisoning with legislative committees with oversight of the Act; and liaisoning with the business community to carry out the Act's tenets.

As an Export Compliance Specialist, you are responsible for, among other duties, reviewing export license applications and, where appropriate, recommending end-use checks (EUCs) to the Division Director.  In that regard, you must conduct independent research and analysis of information collected from public and intelligence resources.  Based on this research and analysis, you must select and recommend candidates for either pre-license checks (PLCs) or post-shipment verifications (PSVs).  Your selections and recommendations must be based on the independent research and analysis you conducted.  Your Export Compliance Specialist responsibilities support BIS's mission by refining the Agency's targeting and analysis of end-use checks.



In Fiscal Year (FY) 2007, you had three different first-level supervisors, including your former supervisor, Tom Andrukonis. While your first-level supervisor, Mr. Andrukonis determined that your performance had declined to an unacceptable level and he implemented a Performance Improvement Plan (PIP) for you. Mr. Andrukonis' PIP began on April 27, 2007 and ended on July 27, 2007.

I became your first-level supervisor on July 23, 2007 with five days remaining on the PIP. I wished to observe, first-hand, your performance before making any determinations about the PIP or your employment. Thus, I deferred any decisions until the Fiscal Year ended. By that time, I had had sufficient opportunity to evaluate your performance. I noted that your performance improved in some of the areas that caused Mr. Andrukonis concern. However, I also determined that overall, your performance was unacceptable. As a result, I rated your performance unacceptable for FY 2007 and implemented a new 60-day PIP period to allow you an additional opportunity to further improve your performance and raise it to a satisfactory level. This PIP period began November 13, 2007 and ended on January 11, 2008. Your performance again did not improve; therefore I am proposing that you be removed from your position and the Federal Service.

**Reason 1:** **Unacceptable Performance of Critical Element 2: Export License Applications Review and Pre-License Checks (PLC)**

Specification 1: The PIP required that you review each export license application for possible pre-license checks (PLCs) with particular attention to your priority country, the United Arab Emirates (UAE). In connection with this duty, you were to maintain a weekly log for all license applications for the UAE. The PIP provided clear guidelines setting out the precise information to be included on the logs. Also, a sample log was provided to you in hard copy and electronic formats. The PIP warned that failure to maintain a proper weekly log three (3) or more times during the PIP would result in unacceptable performance on this Critical Element.

The November 13, 2007 through January 11, 2008 PIP period spanned nine (9) weeks. During those 9 weeks, BIS received 41 license applications for the UAE.

In total, you submitted only four (4) weekly logs. You failed to submit any weekly logs in the last five (5) weeks of your PIP.

Of the 4 logs you submitted, every one was incomplete. Although I provided you guidance and assistance in both the sample log and e-mail feedback, none of the 4 logs you submitted was correctly prepared under the PIP's standards.

The log you submitted for the week ending November 16, 2007 covering the period November 13 - 16, 2007[1] contained no entries in any columns despite BIS receiving six (6) UAE license applications that week.

---

[1] The November 26, 2007 log reflects a shortened week, given the Veterans Day holiday.

The log you submitted for the week ending November 20, 2007 covering the period November 17 - 20, 2007[2] contained four (4) UAE license applications. Notably, BIS received all four (4) of these applications *before* the PIP began. In addition, BIS received two (2) license applications during the November 17 - 20, 2007 time period, but neither appear on your log as having been reviewed.

The log you submitted for the week ending November 30, 2007 covering the period November 24 - 30, 2007, contained one (1) UAE license application. However, BIS also received that license application *before* the PIP began. Significantly, BIS received five (5) UAE license applications for the period November 20 – 30, 2007, but none appear on your log as having been reviewed.

The log you submitted for the week ending December 18, 2007 covering the period from December 1 - 18, 2007 contained five (5) entries for UAE license applications. Four of those five applications, however, were also received *before* the PIP began. Only one of the 5 entries on your log represents a UAE license application received during the December 1 - 18, 2007 period. Significantly though, during that time period, BIS received eleven (11) UAE license applications. Of those 11, only the previously mentioned single entry appears on your log as having been reviewed.

Finally, for the remainder of the PIP period (December 19, 2007 through January 11, 2008), you submitted no logs reflecting any UAE license application reviews. Notably, during that period, BIS received an additional 17 UAE license applications.

The PIP specifically warned that your performance would be unacceptable if you failed to maintain proper weekly logs three (3) or more times during the PIP period. Given the above, during the PIP period, you failed 9 times to maintain proper weekly logs, including failing altogether to submit five different weekly logs. As a result, your performance of this duty under Critical Element 2 is unacceptable.

Specification 2: The PIP also required you to review each export license application for a possible PLC with particular attention to your priority country, the UAE, and warned that your failure to review three (3) or more such licenses during the PIP would result in unacceptable performance on this Critical Element. On several occasions during the PIP period, your Team Lead, Jay Hatfield, and I provided you a suggested list of incoming UAE applications to assist you in identifying potential PLCs.

Based on the information you provided within your logs, you reviewed a total of ten (10) UAE license applications during the PIP. From November 13, 2007 to January 11, 2008, BIS received 41 license applications for the UAE. A review of your logs revealed that nine (9) of the 10 licenses you reviewed were received by BIS *before* the PIP began. Regardless, during the PIP period, you were to review all incoming UAE license

---

[2] The November 20, 2007 log reflects a shortened week, given the Thanksgiving holiday.

applications, but you reviewed only one (1) out of the 41 received. In total, you failed to review forty (40) UAE license applications during the PIP period.

The PIP warned that failure to review three (3) or more UAE licenses would be considered unacceptable performance under this Critical Element. You failed to review 40 UAE license applications. Thus, your performance of this duty under Critical Element 2 is unacceptable.

Specification 3: Under the PIP, you were required to refer at least 3 PLCs which you identified through your own independent research and analysis. At least two (2) of the PLCs had to be for end-users in the UAE and one (1) had to be for an end-user in one of your other assigned countries. The PIP warned that PLC requests had to be timely, meaning they had to be referred within at least three (3) business days of BIS's receipt of the application. Failure to meet these metrics or issue timely PLC referrals 2 or more times during the PIP would result in unacceptable performance.

During the PIP period you referred a total of fourteen (14) PLCs.[3] Two (2) of those referrals was for end-users in the UAE, however neither could have counted towards the metric total required in the PIP. One of your UAE PLC referrals was untimely because you submitted it 11 business days (15 calendar days) after receiving the license application. Additionally, you did not provide the required justification outlining the enforcement concerns for completing this check.

The second UAE PLC you referred was convoluted and could not be processed as a PLC because the license application had already been processed and approved in August 2007. Nevertheless, you referred the matter for PLC and attached a justification memo. The justification memo was insufficient because it too failed to outline the enforcement concerns for completing the check.

You submitted twelve (12) other PLC requests for my review during the PIP. Only one (1) was a timely PLC referral which was for Brazil. This PLC was counted towards your metric total.

The remaining eleven (11) referrals could not be counted because they were submitted: untimely (four (4) days or more after receipt); without proper supporting information as required by the PIP (including no enforcement concern identified); and/or without

---

[3] This total number of PLCs reflects every PLC submission you made, including duplicates and submissions for end-user outside your assigned countries. Specifically, for end-user Tuan Anh Tran (Vietnam), you submitted two requests for this single end-user. Similarly, for end-user Prot-Cap Artigos (Brazil) you submitted five requests for this single end-user. Also, you referred PLCs for Taiwan and Russia, which were not countries assigned to you during the PIP. Ordinarily, multiple PLC submissions for a single end-user are counted as only one request. However, to afford you every opportunity to improve, I have counted your multiple submissions individually, including the one license application which was already approved. Had I not counted each of your submissions individually or the submissions outside your assigned countries, your total number of referred PLCs for the PIP period would have been six (6). Regardless of whether the PLC total is 13 or 6, you did not meet the standards in either quantity or quality for PLCs referrals as required by the PIP.

additional information you were requested to provide. As a result of the above, you referred only one (1) timely, quality PLC consistent with the PIP instructions.

The PIP warned that your performance would be unacceptable if, more than twice, you: a) referred untimely PLCs; b) referred PLCs without showing your research and analysis; or c) you did not meet your metrics (2 PLCs for end-users in the UAE and 1 PLC for an end-user in one of your other assigned countries). Here, you referred thirteen (13) untimely PLCs and all of your PLC referrals failed to include information required to reflect your research and analysis. Therefore, your performance of this duty under Critical Element 2 is unacceptable.

**Reason 2:    Unacceptable Performance of Critical Element 3:  Post-Shipment Verifications and Review of Shipper Export Declarations**

BIS has approved over 400 license applications to the UAE over the past two years. During this same time period, U.S. Census data shows that over 300 shipments were exported with a license. In addition to licensed export transactions, U.S. Census Bureau Foreign Trade Statistics show that U.S. exports to the UAE have increased over 200% since 2002. Notably, the U.S. averages approximately 12,700 export shipments a month to the UAE. Consequently, there are more than sufficient shipments to the UAE which are potential targets for PSV and "no license required" (NLR) checks, especially in areas for civilian aircraft and computer items.

> Specification: Under the PIP, you were required to initiate at least five (5) PSVs. The PIP warned that only PSVs you identified through independent research and analysis would count towards this total. Of the five (5) PSVs: two (2) had to have been NLR checks and three (3) had to have been licensed checks. At least three (3) had to have been for end-users located in the UAE.

During the PIP, you submitted a total of six (6) PSVs request. Of these 6, none were NLR.

You submitted three (2) PSVs for the UAE, but only one (1) was initiated. The remaining, UAE PSV was not initiated because it was not the result of your independent research and analysis. Rather, the PSV was marked "condition 14", which indicates that the PSV was requested from another government agency or another analyst within the team. In this case, the "condition 14" reflected that another OEA Analyst requested the PSV.

In addition to the two UAE PSVs you submitted, you also submitted four (4) non-UAE PSVs. Three (3) of those non-UAE PSVs also had a license condition 14 indicating they were not the result of your independent research and analysis as instructed in the PIP. Therefore, as warned, they could not be counted toward your metric totals.

The final remaining non-UAE PSV could not be initiated and counted because you failed to provide the required additional follow-up information requested.

The PIP warned that only PSVs you identified through independent research and analysis would count towards your metric total of 5 initiated PSVs (2 no license required (NLR) checks and 3 licensed checks). At least 3 of your PSVs had to have been for end-users located in the UAE. None of the PSV requests you submitted during the PIP were NLR. Of the 6 PSV requests that you submitted, 4 could not be counted because they were not the result of your independent research and analysis. One of the remaining 2 PSVs could not be initiated because you failed to provide requested information reflecting research and analysis. Thus, in all, you initiated only 1 out of the required 5 PSVs since the PIP began. Consequently, your performance under Critical Element 3 is unacceptable.

**Reason 3:    Unacceptable Performance of Critical Element 4:  Research and Analysis of Assigned Export Enforcement Projects**

Specification: Under the PIP, you were required to refer sufficient, quality PLCs and PSVs which you were to select through thoughtful, independent research and analysis. Each of your referrals were to be presented to me with a brief, informal 1-2 paragraph justification "memorandum" explaining the reasons for the referral. I provided you a sample justification memo in e-mail format as guidance. The PIP warned that you were to submit your memos to me before initiating a PLC or PSV. Your memos were to contain few or no spelling or grammatical errors and had to be comprehensive and organized. The PIP warned that failure to follow this standard two (2) or more times during the PIP period would result in unacceptable performance.

During the PIP, you submitted twenty (20) end-use check requests for review (13 PLCs and 7 PSVs). Of the twenty checks, you submitted nineteen (19) justification memos. Thus, you failed to submit one (1) memo.

Of the 19 memos you submitted, twelve (12) [4] were submitted directly into the ECASS database, even though you never requested permission to submit in that manner. Indeed, your ECASS submissions depart significantly from the sample justification provided to you with the PIP.

In addition to your 12 ECASS submissions, you provided seven (7) e-mail justification memos. Regardless of how you submitted your justifications, none of your nineteen (19) submissions contained the information that was required by the PIP and included in the sample memo you received. Most significant perhaps is that none of your nineteen (19) memos showed complete, thoughtful, and quality research and analysis. Indeed, none of the 19 memos identified even the enforcement concerns at issue or even explain the reasons for referring the end-use checks.

---

[4] As described in footnote 3, to afford you every opportunity to improve, each PLC referral you made was counted toward this total, including multiple referrals for the same end-user and referrals for end-users outside your assigned countries. The 12 PLC referrals you made into ECASS each was accompanied by a "justification" statement. Each "justification" was also counted under this Critical Element, even if it was merely a statement cut and pasted multiple times for the same end-user.

The PIP warned that if you failed more than two times during the PIP period to refer sufficient, quality end-use checks that were selected through thoughtful, independent research and analysis and justified with proper memos, your performance would be unacceptable. Indeed, performing independent research and analysis is the heart of your Export Compliance Specialist position. Nevertheless, you failed to submit justification memos reflecting this research and analysis 19 times during the PIP period. One memo you never even submitted, and of those 19 you did submit, none comported with the PIP's requirements. Thus, in total you failed to satisfy this PIP standard 20 times. Accordingly, your performance under Critical Element 4 is unacceptable.

In all, throughout the PIP period, I provided you detailed guidance and feedback. However, you did not apply my comments, suggestions or instructions nor did you provide me additional information when requested.

The PIP expressly informed you that your unacceptable performance of the identified duties was of such significance and so fundamental to your Export Compliance Specialist job, that if you remained unacceptable in even one (1) of those duties, you would fail the entire Critical Element and the PIP. Given all of the above, it is clear that you did not raise your performance to an unacceptable level in even one of those duties. Thus, your performance remains unacceptable in Critical Elements 2, 3 and 4. As a result, I am proposing that you be removed from your Export Compliance Specialist position for unacceptable performance.

## Determination of Penalty

In determining the appropriate penalty to propose, I considered the critical nature of your duties which involve reviewing exports of national security and proliferation concern. I have determined that your inability to complete effective independent research and analysis and to select proper end-use checks has serious consequences that could impact national security.

Indeed, one of the UAE license applications BIS received during the PIP period which you failed to log, review, and refer for an end-use check (either PLC or PSV), was identified as an Iranian owned company and of serious concern by the Export Control Officer (ECO) assigned to the UAE. A colleague of yours actually referred the application for a PLC after you failed to refer it for either a PLC or PSV. As a result of this PLC, the Agency learned that the UAE consignee is an unreliable recipient of U.S. origin commodities and has possibly provided aluminum tubes to support Iran's nuclear program. The consignee has been determined an invalid recipient who may have attempted to divert/re-export items to Iran in violation of American export laws. As this example shows, there is a real and intolerable risk to you not performing your fundamental Export Compliance Specialist duties at an acceptable level.

I have also considered that your performance problems have been long standing. Although Mr. Andrukonis implemented a PIP for you before I became your supervisor, I took no action at the end of that PIP and instead reached my own conclusions about your performance. Based on my assessments, your performance by the close of FY 2007 was unsatisfactory. Therefore, I implemented a PIP to reflect my expectations of at least marginal performance from an Export Compliance Specialist. Despite having provided you samples, feedback, instruction and

guidance, your performance remained unacceptable. Therefore, I do not believe that you are able to adequately perform your Export Compliance Specialist job.

In making this proposal, I also considered your nearly twenty-five years of Federal service. However, the longevity of your employment does not outweigh the fact that your performance remains unacceptable despite your having received ample opportunity to improve.

This notice is a <u>proposed action only</u>, and any reply you submit to the deciding official in this matter will be given full consideration in arriving at a final decision.

## <u>Rights</u>

<u>To Reply</u>: You may reply to this notice of proposed removal in writing, orally, or both. Your Reply must be made to the deciding official, Mr. Glenn Krizay, Director, Office of Enforcement Analysis, Room 4065, 1401 Constitution Avenue, N.W., Washington, D.C. 20230. Should you wish to make an oral Reply, you must arrange an appointment with Mr. Krizay, by calling him at (202) 482-4550 within seven (7) calendar days of your receipt of this notice. Your written Reply must be made within 15 calendar days of your receipt of this notice. If you choose to do so, you may furnish affidavits or other documentary evidence in support of your reply. Mr. Krizay will fully consider any Reply you submit.

If you need an extension of the time limit for your Reply, you must submit to Mr. Krizay a written request within 7 calendar days with specific reasons why you need the extension. Mr. Krizay will advise you as to whether an extension will be granted.

<u>Representation</u>: You may designate a representative in this matter. If you designate a representative, you must do so in writing by notifying Roberto Lopez, Senior Employee and Labor Relations Specialist, Office of Human Resources Management, ITA, Room 7060. Your designation must include the name, title (if any), and address of the representative you have designated. You may contact Mr. Lopez telephonically at (202) 482-8086 or via email at Roberto_Lopez@ita.doc.gov.

<u>Materials Relied Upon</u>: You and/or your representative may review the materials relied upon to propose this action. You may arrange to do so by contacting Mr. Lopez telephonically at (202) 482-8086 or via email at Roberto_Lopez@ita.doc.gov.

If you are in a duty status, you may use a reasonable amount of time to review the supporting material, secure affidavits or other evidence, and to answer this notice. You may arrange to do so by contacting Mr. Krizay in advance.

You will receive a written decision from Mr. Krizay concerning this proposed action as soon as possible after your Reply is received or after the expiration of the 15-day limit if you do not Reply. The written decision will be based on the record in this case, as well as any written and/or oral Reply you make.

If you feel you would benefit by speaking to a counselor, the Employee Assistance Program (EAP) is a voluntary and confidential service provided to you for your use. Should you wish to make use of EAP, you may call (202) 482-1569.

If you have any questions regarding your procedural rights in this matter, would like to review the information relied upon for this Notice, or have questions regarding your rights and responsibilities, you should contact Mr. Lopez.

Please sign and date the receipt acknowledgment copy of this memorandum. Your signature merely indicates that you have received a copy of this memorandum; it does not indicate that you agree or disagree with its contents. However, your refusal to sign the receipt acknowledgment copy does not void its contents.

RECEIPT ACKNOWLEDGED:

_Employee Refused to Sign_        _Feb 27, 2008_
Janet Howard                                Date of Receipt
_Todd Gwells, Assistant Director, OEA_

                                        _2-27-08_
Witness by                                 Date of Receipt

Cc:  Glen Krizay, Director OEA
      Roberto Lopez, ITA HR

# EXHIBIT 5

**JANET HOWARD'S
OPPOSITION TO PROPOSED REMOVAL**

**(PROCEDURAL ERRORS AND MANAGEMENT
INCONSISTENCIES (PEMI))**

March 27, 2008

Memorandum For:    Mr. Glenn Krizay
                   Director, Office of Enforcement Analysis

From:              Matthew F. Fogg representing Ms. Janet Howard
                   Export Compliance Specialist
                   Operations Support Division
                   Office of Enforcement Analysis

Subject:           Opposition to Proposed Removal

This memorandum serves as official notice that respondent "Janet Howard" opposes the pending action to be removed from her position as an Export Compliance Specialist, GS-1801-12 with the Bureau of Industry and Security (BIS), Office of Enforcement Analysis (OEA), U.S. Department of Commerce (DoC). On February 27, 2008, the OEA issued the respondent a Notice of Proposed Removal. The following statement was offered as the rationale for the respondent's removal: *"for unacceptable performance and to promote the efficiency of Service, in accordance with Title 5 of the Code of Federal Regulations, Chapter 43."*

Respondent alleges that the action taken by Todd Willis, Assistant Director, Office of Enforcement Analysis has erroneously been executed and serves as reprisal for her involvement in protected EEO activity. A narrative below provided within this opposition includes: (a) background addressing Ms. Howard's employment with BIS; and (b) a detailed listing of procedural errors and management inconsistencies associated with this removal action.

## I. Background

The Office of Enforcement Analysis mission is to carry out the Agency's export enforcement responsibilities as mandated by the Export Administration Act of 1979 and its' implementing regulations. As an Export Compliance Specialist, who has served for twenty five (25) years with the Office of Enforcement Analysis Ms. Howard performs, among other duties, the review of export license applications and, where appropriate, recommends end-use checks (EUCs) to the Division Director. In that regard, she conducts independent research and analysis of information collected from public and intelligence resources. Based on this research and analysis, the respondent selects and recommends candidates for either pre-license checks (PLCs) or post-shipment verification (PSVs). Respondent Howard selections and recommendations are based on the independent research and analysis she conducts. Despite management's failure to provide Ms. Howard with the essential tools to perform her job, she has continued to perform tasks in the most efficient manner feasible. Do note, Ms. Howard's exemplary contribution to BIS's mission garnered her a ***Bronze Medal Award for Superior Federal Service***, a "**Step Increase,**" and "**Time Off Award**" during FY 07.

As noted in OEA's Letter of Proposed Removal, Ms. Howard had ***three (3) different first-level supervisors*** during the FY 2007 rating period. Throughout this managerial inconsistency, and

1

despite the organizational disruption, Ms. Howard continued to perform her assigned tasks in an exemplary manner.

## II. Procedural Errors and Management Inconsistencies (PEMI)

### PEMI 1: OEA Failed to Initiate Interim Rating During FY 07

DoC procedures as promulgated in the DoC Performance Management Handbook prescribes that "*interim ratings should be completed when a supervisor leaves his or her position and employee has been in a covered position for 120 days.*" According to DoC Performance Management Handbook, the interim rating is to "*provide input from a departing supervisor to assist a new supervisor who is preparing a final rating of record.*"

Tom Andrukonis (former first line supervisor), who put into effect the initial FY 07 Performance Improvement Plan, left the division on July 23, 2007. (**The PIP covered the period April 27, 2007 thru July 27, 2007**) Upon departing, Mr. Andrukonis failed to complete an interim rating, and he failed to provide Ms. Howard with any update on her performance. Mr. Todd Willis became the respondent's supervisor on July 23, 2007, only five days before her PIP was to conclude. Despite his brief tenure at OEA, Mr. Willis concluded at the end of the FY 07 that he: "*rated [Ms. Howard's] performance unsatisfactory for FY 2007 .*" Mr. Willis, a novice OEA supervisor, who issued the proposed removal, had worked at OEA circa three months of the FY07 rating cycle. **Notably, Mr. Willis failed to obtain and provide Ms. Howard with the required "interim rating" to assess her FY07 performance.**

### PEMI 2: OEA Failed to Conduct Periodic Meetings Regarding FY 08 Performance Improvement Plan

Page 6 of the PIP initiated by Todd Willis (See November 13, 2007 memorandum) expressly stated: "*I will also meet with you periodically during the PIP period to provide you with feedback and guidance as needed.*" During the PIP cycle, ***not one (1)*** such meeting ever took place.

### PEMI 3: OEA Established Unreasonable Performance Improvement Plan Standards

According to DoC's governing Performance Standards: "*Performance Standards should be attainable, objective, measurable, realistic, and clearly stated in writing.* The Department requires the use of Generic Performance Standards - Appendix A).

The PIP as outlined by Todd Willis included performance levels that were inconsistent with Appendix A: Generic Performance Standards. In fact, standards imposed on respondent were at a ***greater level*** than those for general population. For example, in Critical Element 4 it is

asserted that respondent - must provide justification memos "that contain few to **_no_** spelling or grammatical errors." This standard is consistent with a Level 5 "Outstanding Rating." Even a Level 4 exceptional standard allows for "minor revisions." While respondent has continued to execute thoroughness and accuracy in her work products. she contends that management has held her to standards that go beyond the objective measurement of the PIP.

**PEMI 4:   OEA Failed to Provide Essential Resources**

Despite respondent's numerous requests, throughout much of the time Ms. Howard spent on the erroneous unjustified PIP. she was not provided with essential resources.  In particular, respondent was denied internet access.  As a consequence. Mr. Todd Willis placed Ms. Howard on a PIP citing in his November 13, 2007 memo subject: Performance Improvement Plan for the following: "*you were required under this Critical Element to research, gather and analyze export controls information from available resources.*" "*...you failed to do so and instead relied too heavily upon the <u>interagency process</u>*"

**PEMI 5:   OEA Failed to Provide Training Opportunities**

Further, to enhance her knowledge. skills, and abilities Ms. Howard submitted an Individual Development Plan (IDP) for training for Todd Willis. first line supervisor.  Mr. Willis provided no response to respondent's training request.  DoC procedures expressly provide for employee development training.

**PEMI 6:   OEA Engaged in Disparate Treatment**

OEA officials designed a PIP that imposed quantity and quality work requirements more stringent than those imposed on the general OEA population.

| Requirements | Janet Howard | General Population |
|---|---|---|
| Initiate 15 PLCs | Within 60 Days | Within 365 Days |
| Initiate 35 PSVs | Within 60 Days | Within 365 Days |
| NLR 10-15 | Within 60 Days | Within 365 Days |

**PEMI 7:  OEA's Conflicting Assessment of "Janet Howard's" Accomplishments Meritorious and Superior Performance**

Management has assessed respondent's performance as unsatisfactory in FY07.  Yet, so far to date (March 27, 2008), note the following:

- On January 17, 2007 management awarded Ms. Howard *a "Time Off Award."*

- On January 21, 2007 management awarded Ms. Howard a *"Within Grade Step Increase."*

- In January 2007 management awarded Ms. Howard a *"Bronze Medal Award for Superior Service."*

According to the DoC policy and procedures:  *"An employee who is otherwise eligible receives a within-grade increase when his or her performance is at Level 3 (acceptable level of competence). This means that during the period of time since that rating the employee has continued to perform his or her responsibilities in a manner warranting an increase in* basic pay."

**PEMI 8:  OEA's Failure to Provide FY08 Progress Review**

First line Supervisor, Todd Willis never held a progress review with Ms. Howard as prescribed by DoC policies and procedures. Note the following: *"at a minimum, rating officials must conduct one formal progress review with each of their employees...."*

The rating period began October 1, 2007.   On November 13, 2007 - about seven (7) weeks later Mr. Willis put the respondent Ms. Howard on a PIP. Two (2) weeks into the PIP, Ms. Howard received an email from Todd Willis telling her that she had failed the PIP.  One (1) week later, she received a similar email saying she had failed the PIP.   Mr. Willis, who relied solely on e-mail interface, at no time held a progress review as prescribed by DoC procedures.

**PEMI 9:   OEA's Retaliatory Treatment**

Respondent being placed on a PIP for deficient performance is a pretext, and serves as retaliation for Ms. Howard's involvement in equal employment opportunity (EEO) and whistleblower activities.  Do note, the following key dates:

- January 26, 2007, Ms. Howard appeared before Unites States District Court Judge, the Honorable John Bates regarding the class action lawsuit, (Janet Howard, et. at, v. Carlos Gutierrez). Deputy Assistant Secretary for Administration of the U.S. Department of Commerce, and John Gunther was also in attendance.

- February 1, 2007, Approximately 4 working days later, respondent's first line supervisor Tom Andrukonis informed her that he had *"problems with [Ms. Howard's] performance."*

- March 14, 2007, Ms. Howard received a notice from the Office of Special Counsel (OSC) about her whistleblower concerns related to OEA's prohibited personnel practices.

- March 22, 2007 Ms. Howard was placed on the initial PIP.

- July 22, 2007 Glenn Krizay (second line supervisor/office director) requested her EEO interrogatories and her responses for a pending EEO complaint. The complaint was filed against OEA management for wrongfully placing Ms. Howard on the FY 2007 PIP.

**PEMI10: OEA's First Line Supervisor Inability to Apply Consistent Standards**

Todd Willis first line supervisor who placed respondent on a PIP November 13, 2007 was *"incapable" of accurately assessing Ms. Howard's performance*. **This assertion is further evident by Todd Willis' email (11/13/07) to subordinate Jay Hatfield soliciting "*help*" in monitoring Ms. Howard's performance.**

*"Jay...... "CONFIDENTIAL" **CONFIDENTIAL***

*Starting today, Tuesday, 11/13, I would like for you and I to review Janet's checks together. First to ensure that I am applying consistency in the standards in conducting EUC's....."*

*I appreciate your help, Todd.*

**PEMI11:  OEA's Failure to Provide Performance Management Training**

OEA managers failed to adhere to Commerce Standards that prescribe the following: *"Operating Units should provide performance management training for employees to increase their understanding of the process, management's authority, and the roles and responsibilities of all individuals in the process.  On an annual basis, operating units must provide refresher training, briefings, and information on all aspects of the performance management system.*

**PEMI12: OEA's Accelerated FY08 Rating Process**

In accordance to Chapter 5 of DoC Handbook Re: Timetable of Performance Management Activities Annual Performance Cycles, appraisal periods are to cover October 1st through September 30th of the following year. *"The minimum appraisal period is 120 days."*

In haste to record Ms. Howard's performance as deficient, OEA placed respondent on a PIP without the benefit of a progress review.  To respondent's knowledge, no other similarly

situated employee was rated on an accelerated 60-day cycle.  Respondent <u>was not</u> serving on a PIP, when the November 13, 2007 (FY08) PIP was issued.

**PEMI13: Management's FOIA Response Regarding OEA Performance Improvement Plans**

Management consistently sent Ms. Howard mixed signals about the PIP status.  She was reportedly put on a formal PIP effective March 27, 2007 (Due to an injury and the need for sick leave, Ms. Howard PIP later resumed on April 27, 2007).  The PIP was scheduled to terminate July 27, 2007.  Ms. Howard's repeated requests for status updates went unanswered by managers at every level.  Therefore, she made a number of FOIA requests to obtain data about PIPs initiated within OEA. **Notably, FOIA responses received from <u>both</u> Roberto Lopez (May 22, 2007), and Linda Bell (June 11, 2007) asserted no OEA employee was recorded as being on a PIP.  In fact, the memo from (Roberto Lopez, OHRM Employee Relations Person and FOIA Officer), expressly stated:: _<u>"OHRM Employment Labor Relations does not have any records or information regarding any employees for OEA being placed on a Performance Improvement Plan (PIP) as stated in your request</u>."_**  Interestingly Mr. Lopez, the same person who witnessed Ms. Howard being placed on a PIP, provided the conflicting statement about OEA PIP status.

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) HOWARD, JANET | | 2. Social Security Number | 3. Date of Birth 12/31/47 | 4. Effective Date 01/21/07 |
|---|---|---|---|---|

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code 847 | 5-B. Nature of Action GROUP TIME-OFF AWARD | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number EXPORT COMPLNC SPECLST 0A    980691 |
|---|---|

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award 8.00 | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 12A. Basic Pay | 12B. Locality Adj. .00 | 12C. Adj. Basic Pay | 12D. Other Pay .00 | 20A. Basic Pay | 20B. Locality Adj. .00 | 20C. Adj. Basic Pay | 20D. Other Pay .00 |
|---|---|---|---|---|---|---|---|

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization BUREAU OF INDUSTRY AND SECURITY O/ASST SEC EXPORT ENFORCEMENT OFFICE OF ENFORCEMENT ANALYSIS SOUTH ASIA/EUROPE DIVISION CM 674303000100000000  PP 02 2007 |
|---|---|

## EMPLOYEE DATA

| 23. Veterans Preference 1    1 - None    3 - 10-Point/Disability    5 - 10-Point/Other    2 - 5-Point    4 - 10-Point/Compensable    6 - 10-Point/Compensable/30% | 24. Tenure 1    0 - None    1 - Conditional    1 - Permanent    3 - Indefinite | 25. Agency Use | 26. Veterans Preference for RIF YES  X  NO |
|---|---|---|---|

| 27. FEGLI W0    BASIC-5X ADDITIONAL | 28. Annuitant Indicator 9    NOT APPLICABLE | 29. Pay Rate Determinant 0 |
|---|---|---|

| 30. Retirement Plan 1    CS | 31. Service Comp. Date (Leave) 04/17/83 | 32. Work Schedule F    FULL TIME | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|

## POSITION DATA

| 34. Position Occupied 1    1 - Competitive Service    3 - SES General    2 - Excepted Service    4 - SES Career Reserved | 35. FLSA Category E    E - Exempt    N - Nonexempt | 36. Appropriation Code | 37. Bargaining Unit Status 7777 |
|---|---|---|---|

| 38. Duty Station Code 11-0010-001 | 39. Duty Station (City - County - State or Overseas Location) WASHINGTON  DIST OF COLUMBIA  DC |
|---|---|

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks
TIME-OFF AWARD HOURS SHOWN IN BLOCK 20
AWARD HOURS MUST BE USED WITHIN 1 YEAR

| 46. Employing Department or Agency DEPARTMENT OF COMMERCE | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| 47. Agency Code CM 67 | 48. Personnel Office ID 1911 | 49. Approval Date 01/21/07 | PERSONNEL OFFICER |

5-Part 50-316

Exhibit 54    3

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 298-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| HOWARD, JANET | ~~~~~~~~ | 12/31/47 | 01/21/07 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 893 | REG WRI | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| Q7M | REG 531.404 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | EXPORT COMPLNC SPECLST |
| | 0A          980691 |

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 06 | | 77,897.00 | PA | GS | 1801 | 12 | 07 | 80,123.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 65,686.00 | 12,211.00 | 77,897.00 | .00 | 67,563.00 | 12,560.00 | 80,123.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | BUREAU OF INDUSTRY AND SECURITY |
| | O/ASST SEC EXPORT ENFORCEMENT |
| | OFFICE OF ENFORCEMENT ANALYSIS |
| | SOUTH ASIA/EUROPE DIVISION |
| | CM 674303000100000000    PP 02 2007 |

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|
| 1 - None  3 - 10 Point/Disability  5 - 10 Point/Other | | 1 | | YES [ ]  NO [X] |
| 2 - 5 Point  4 - 10 Point/Compensable  6 - 10 Point/Compensable/30% | 0 - None  2 - Conditional | | |
| | 1 - Permanent  3 - Indefinite | | |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| WO   BASIC-5X ADDITIONAL | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1   CS | 04/17/83 | F   FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service  3 - SES General | E | | 7777 |
| 2 - Excepted Service  4 - SES Career Reserved | E - Exempt  N - Nonexempt | | |
| 1 | | | |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON   DIST OF COLUMBIA   DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

WORK PERFORMANCE IS AT AN ACCEPTABLE LEVEL OF COMPETENCE.

Exhibit 30 Page 40

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF COMMERCE | |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
| CM 67 | 1911 | 01/20/07 | PERSONNEL OFFICER |

TURN OVER FOR IMPORTANT INFORMATION
3-Part  50-315                    1 - Employee Copy - Keep for Future Reference

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6237

# UNITED STATES
# DEPARTMENT of COMMERCE

# BRONZE MEDAL AWARD

## Presented to



| | | |
|---|---|---|
| JANET HOWARD | SHARON GLOVER | RAVEN AUSTIN |
| ERIN KELLY | SARAH HEIDEMA | ANTOINETTE DYSON |
| ROBERT LITTLE | SYLVIA JIMMISON | HARLAN ALLEN |
| RENEE OSBORNE | DAVID NARDELLA | RENEE BOHRER |
| ELIZABETH PROCTOR | ORESTES THEOCHARIDES | RONALD ORZEL |
| SANDRA RUF | JACQUELINE WASHINGTON | TAWANNA THOMAS |
| MICHAEL VACCARO | JENNIFER WATTS | ZORAIDA VAZQUEZ |
| DANIEL HILL | KENNETH WHALEY | GAY SHRUM |
| DOUGLAS BROWN | ELIZABETH SCOTT | MICHAEL TURNER |
| MARGARET CAHILL | EILEEN ALBANESE | ELSIE CARROLL |
| FREDERICK DAVIDSON | COLLEEN MYRHOL | ALAN HELLAWELL |

## for Superior Federal Service

**CITATION:**

*For outstanding leadership in the task forces of the Bureau of Industry and Security's Organizational Development Initiative.*

December 2006

_Acting Under Secretary for
Industry and Security_



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505
(202) 254-3600

MAR 1 4 2007

Ms. Janet Howard
PO Box 1454
Spotsylvania, VA 22553

### *Re: OSC File No: MA-07-0753*

Dear Ms. Howard:

On February 23, 2007, we sent you our preliminary report, which set forth our proposed factual and legal determinations regarding your case. In that letter, you were notified that you had thirteen days to respond to the report. However, we have not received any comments from you concerning that report.

Accordingly, based on the facts and law applicable to your circumstances, as detailed in our preliminary report, we are closing the file. Because you have alleged reprisal for whistleblowing, you may have a right to seek corrective action from the Merit System Protection Board (MSPB) under the provisions of 5 U.S.C. §§ 1214(a)(3) and 1221. The Merit Systems Protection Board regulations concerning rights to file an individual right of action with the Board can be found at 5 C.F.R., parts 1201-1206 and 1209.

Sincerely,

J. Sandra Thomas
Complaints Examiner
Complaints Examining Unit



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505
(202) 254-3600

MAR 1 4 2007

Ms. Janet Howard
PO Box 1454
Spotsylvania, VA  22553

### Re: OSC File No: MA-07-0753

Dear Ms. Howard:

The purpose of this letter is to notify you that you may have a right to seek corrective action from the Merit Systems Protection Board (MSPB).  As we informed you in our closure letter of this date, we have terminated our inquiry into your allegations. Because you alleged that you were the victim of the prohibited personnel practice described in 5 U.S.C. § 2302(b)(8), commonly called reprisal for whistleblowing, you may have the following rights.

You may seek corrective action from the MSPB under the provisions of 5 U.S.C. §§ 1214(a)(3) and 1221 (individual right of action) for any personnel action taken or proposed to be taken against you because of a protected disclosure that was the subject of your complaint to this office.  You may file a request for corrective action with the MSPB within 65 days after the date of this letter.

The Merit Systems Protection Board regulations concerning rights to file an individual right of action with the Board can be found at 5 C.F.R., parts 1201-1206 and 1209.  If you choose to file such an appeal you should submit this letter to the Board as part of your appeal.

Additional information about filing an appeal with the MSPB is available at the MSPB webpage:  www.mspb.gov.

Sincerely,

J. Sandra Thomas
Complaints Examiner
Complaints Examining Unit

From:       TODD WILLIS
To:         JAY HATFIELD
Date:       11/13/2007 5:40:07 PM
Subject:    Janet's checks - confidential

** Confidential **

Jay,

Starting today Tuesday, 11/13, I would like for you and I to review Janet's checks together.  First to ensure that I am applying consistency in the standard for conducting EUCs and second I will be working closely with her over the next 60-days to improve her work.  Let's discuss the best way to accomplish this and not slow down our processing times.

I appreciate your help.

Todd

 **UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

May 22, 2007

REF: Janet Howard
Filing Date: December 19, 2006 (1)
February 22, 2007 (2)
EEO Complaint: 06-67-00207 (1)
07-67-00010 (2)

MEMORANDUM FOR:    Charla Sizemore
EEO Investigator
Office of Civil Rights
Office of the Secretary
U.S. Department of Commerce

FROM:    Roberto Lopez
Employee Relations Specialist
Office of Human Resources Management
International Trade Administration
U.S. Department of Commerce

SUBJECT:    Document Request

Ms. Sizemore:

Attached, please find the documentation requested in reference to your investigation dated March 27, 2007, regarding EEO Complaint 07-67-00010, filed by Janet Howard. As a response to your request, I am attaching the following documents:

1. Copy of all documentation related to Complainant's being placed on a 90-day Performance Improvement Plan (PIP) effective March 27, 2007.

**In regards to the following documents:**

2. List of OEA employees placed on a PIP between January 2004 – March 2007, with date started, reason for placement, duration of PIP, and outcome.

51  Page  2

**The Office of Human Resources Management, Employee and Labor Relations does not have any records or information regarding any employees from OEA being placed on a performance improvement plan as stated in your request above.**

If you have a need for further data or have any questions about this submission, please contact Roberto Lopez, Employee and Labor Relations Specialist, OHRM on (202) 482-8086 or via e-mail at Roberto_Lopez@ita.doc.gov. Thank you.

Attachments

Exhibit 51 Page 3



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

June 11, 2007

Ms. Janet Howard
No Fear Coalition Member

Dear Ms. Howard:

This is in response to your Freedom of Information Act (FOIA) request for the number of Bureau of Industry and Security (BIS) employees put on a performance improvement plan, from FY 2003 to the present.

There are no records of any employee in BIS being placed on a performance improvement plan during that time frame.

You have the right to appeal this response to your FOIA request. An appeal must be received within 30 calendar days of the date of this letter by the Assistant General Counsel for Administration, Room 5898-C, U.S. Department of Commerce, 14th & Constitution Avenue, NW, Washington, DC 20230. Your appeal may also be sent by e-mail to FOIAAppeals@doc.gov or by facsimile (fax) to 202/482-2552. The appeal must include a copy of the original request, this response to the request, and a statement of the reason why withheld records should be made available and why denial of the records was in error. The submission (including e-mail and fax submissions) is not complete without the required attachments. The appeal letter, the envelope, the e-mail subject line, and the fax cover sheet should be clearly marked "Freedom of Information Act Appeal." The e-mail, fax machine, and Office are monitored only on working days during normal business hours (8:30 am to 5:00 pm, Eastern Standard Time, Monday through Friday). FOIA appeals posted to the e-mail box, fax machine or Office after normal business hours will be deemed received on the next business day.

Sincerely,

Linda M. Bell
Freedom of Information Act Officer

FOI 07-062





6/29/2007

Assistant General Counsel
  For Administration
Room 5898-C
U.S. Department of Commerce
14th & Constitution Avenue, NW,
Washington, DC 20230

REF.:  **Freedom of Information Act Appeal**

This correspondence transmits a timely appeal to the Department's response to my FOIA request dated May 8, 2007.  This appeal contains:

- A copy of the original May 8, 2007 request;
- Department of Commerce response to the request dated June 11, 2007; and
- A statement of the reason why withheld data should be made available and why records provided was in error.

**Statement of Reason/Record Misrepresentation**

On May 8, 2007 I submitted a request petitioning the number and race breakout of employees within the Bureau of Industry and Security (BIS) that have been put on a Performance Improvement Plan (PIP) for FY 2003 thru the date of the request (May 8, 2007).

On June 11, 2007 I received a response through Ms. Linda Bell from Roberto Lopez (OHRM) that:

**"THERE ARE NO RECORDS OF ANY EMPLOYEE IN BIS BEING PLACED ON A PERFORMANCE IMPROVEMENT PLAN DURING THAT TIME FRAME."**

**Re**cognizing that this response was clearly erroneous, I contacted the FOIA officer (Linda Bell) to get an understanding of the FOIA process.  She informed me that she had received data input from Roberto Lopez, a Human Resource Official.  According to FOIA officer, Mr. Roberto Lopez had reported **that there is no record** of any BIS employee being placed on a PIP during this time frame.  Mr. Lopez's statement and the resulting FOIA data are clearly false.  Such misrepresentation of material facts is most disconcerting.  Do note:  March 27, 2007 Mr. Lopez was present in the office of my supervisor (Thomas Andrukonis) and witnessed me being placed on the PIP.  (The PIP was initiated on or about a month after I had filed an EEO Complaint against Mr. Lopez (OHRM official and FOIA respondent) in connection with denial of leave donor program benefits.)

Exhibit 51    5

This appeal petitions that the Department re-examine its records to produce accurate accounting of PIP data as requested in my original FOIA letter dated May 8, 2007. The misrepresentation, falsification, and / or omission of material fact in connection with this FOIA record are indefensible. Mr. Lopez, a responding official to the FOIA request, had first hand knowledge that I had been placed on a PIP during the covered period. Yet, he failed to make the proper disclosure in responding to the FOIA officer. Moreover, I have first hand knowledge that other BIS employee(s) have been placed on PIP's during the period of time in question.

To reiterate, *__accurate information was omitted from the official FOIA response__*. In light of the fact that I have been denied sought records pertaining to BIS and PIP activity, I hereby request on appeal that such records in their entirety covering FY 2003 through May 28, 2007 be provided.

Sincerely,

*Janet Howard*

Janet Howard
No Fear Coalition Member

Enclosure:

Exhibit **51** Page **6**

CRRiF 07-242
07-062

May 8, 2007

Ms. Brenda Dolan
Freedom of Information Officer
Department of Commerce
14th and Constitution Avenue NW
Room 6204
Washington, D.C. 20230

Dear Freedom of Information Act Officer:

Under the Freedom of Information Act (FOIA) (5U.S.C. 552) I request the following date on
personnel action: FY 2003 to present the total number of Bureau of Industry Security's (BIS)
employees put on a performance improvement plan (PIP).

•     of the above numbered amount how many are African- American employees .

•     of the above number amount how many are White employees.

•     of the above number amount how many are in the Office of Enforcement Analysis.

Please call me, if I need to modify or narrow the scope of this request. Do note: No Fear
Coalition is a non-profit organization. Since this request is made in the public interest and the
results are intended for the public dissemination, I hereby request that all fees be waived. If all
or any part of this request is denied, please cite the specific exemption (s) that you believe
justifies your refusal to release the information and inform me of your administrative appeal
process. I would appreciate your handling of this request as quickly as possible. If you have any
questions regarding this request, I can be reached on (202) 482-0717 .

Janet Howard

Janet Howard
No Fear Coalition Member

Exhibit 51 Page 1

ITA

Wednesday, July 25, 2007

MEMORANDUM FOR:      WENDY WYSONG
                                Export Enforcement

                                Thomas Andrukonis
                                EXPORT ADMINISTRATION

                                Charla L. Sizemore
                                OFFICE OF CIVIL RIGHTS

FROM:                      JANET HOWARD
                                Office of Enforcement Analysis

SUBJECT:                 **STATUS OF JANET HOWARD'S PERFORMANCE IMPROVEMENT PLAN**

On March 27, 2007 I was placed on a Performance Improvement Plan (PIP) for 90 days.

- On March 27, 2007 I was injured in the health unit, hospitalized and was away from work for 30 days.
- On April 27, 2007 I returned back to work.
- On April 12, 2007 Charla L. Sizemore, Office of Civil Rights by-way-of Interrogatories asked the following questions:

> 1. You allege that effective March 27, 2007; you were placed on a PIP for 90 days although Tom Andrukonis (who gave you the PIP) would be on a detail outside of the office during that time period.
>
> 2. Who is assigned to monitor your performance in Mr. Andrukonis' absence? How was this person chosen?
>
> 3. Is the person you identified above familiar with the circumstances under which you were placed on a PIP? If so, how did they become familiar with your work performance?

- On or about 4/27/ 2007 I asked Tom the following question:

> 1. Tom,
> Prior to my being away from the office on sick leave and after being placed on a PIP, you said I was to work and report directly to you. Originally, I took the approved application screen entries below to Orestes but he told me that I was to give everything to you.   Since you are in transition, does that still stand?
>
> Janet

**On 5/2/07 he said:**        **absolutely - I'm still here and all your work products are being reviewed and acted on by me so please send to me this and anything else you have. Thanks**

**On 6/22/07 Tom said:  I'll be back on Monday July 2. I think it would be good for you, me and Jonathan to sit down and meet on Tuesday July 3 so we can discuss my transition to EA which is effective July 9 and Jonathan reviewing your work items for a period of time.**

**Is 10:30am on Tuesday 7/3 okay for you to meet with Jonathan and me in his office?  Let us know thanks. - Tom**

**On 7/9/2007 Tom said: I'm now down in EA in my new position so you should contact Jonathan direct from now on re: leave ands work matters – Tom.**

Given the above transaction and tracking of the PIP I was placed on by Mr. Andrukonis, I am requesting the status of the PIP and Responses to Mrs. Sizemore's **April 12, 2007** inquiry. Mrs. Sizemore has also asked **how long do I remain on this PIP**?

Recently, Mrs. Charla L. Sizemore asked me via interrogatories for the status of my Performance Improvement Plan. To expedite a response, I am carbon copying her on this email.

7 27 2007

# MEMORANDUM OF UNDERSTANDING

TO:       Glenn Krizay, Director
          Office of Enforcement Analysis (OEA)

          Todd Wilson, Division Director
          OEA Support Division

FROM:     Janet Howard
          Intelligence Analyst
          OEA

SUBJECT:  Performance Improvement Plan (PIP) Status


This is a memorandum of understanding with highlights of a meeting held this morning with (Glenn Krizay and Todd Wilson to discuss my Performance Improvement Plan (PIP) Status.

March 27, 2007, I was placed on a 90 day Performance Improvement Plan (PIP) by Thomas Andrukonis. Mr. Andrukonis stated in a 4/26/2007 & 5/2/2007 email to me and, in his interrogatory response to the Office of Civil Rights (OCR) that he was assigned to monitor my performance for the duration of the 90 day PIP.

The Office of Enforcement Analysis is under new office director and division director leadership. In an effort to know who would be responsible for reviewing PLC's /PSV's I initiate, I asked for a meeting. Prior to the meeting, OCR showed that I was being monitored on a PIP by Thomas Andrukonis. Tom delegated the monitoring to interim office director Jonathan Carson. OEA organizational chart places me under the supervision of the new support division director (Todd Willis).

During the 90 day PIP period, I received 1 review from Tom. He followed it up with a 5/30/07 email saying "So overall, things look good in all areas but as we discussed we need to focus now on getting some nlr PSV's so we can hit the required 10-15 for the year".

Glenn shared with use that he thought I had spoken with Jonathan with regards to him monitoring me on the PIP. I have never spoken with Jonathan on this issue. Tom sent me an email on 6/22/07 asking if he Jonathan and I could meet Tuesday 7/3 at 10:00 am. We never had that meeting. It became necessary for me to know how much information had been shared with Glenn & Todd about the PIP, the conclusion of the PIP and, how/when do I receive some type of document of the outcome.

I providing background information to include the bronze medal award I have received, emails, foia request, interrogatory excerpts and, 2 standards form 50 in my defense of why I thought I should have never been placed on a PIP.

The meeting concluded with the understanding that:

- Glenn would review all information pertaining to the 90 day PIP and a decision in the form of some type report would be given to me.
- That I would email Glenn both sets of interrogatories from Charla Sizemore (OCR) and my response to the interrogatories.

- My first line supervisor is Todd Willis.

- All daily work assignments and documents for review will be given to him.

- Given my 13 years of Class Action Litigation with the department, it was agreed that all parties involved would began with a clean slate.

This is the basic understanding of today's meeting. If your understanding is different from what is stated above, please make the necessary corrections and email you corrections back to me.

Thank you.

Janet Howard

Case 1:08-cv-00421-PLF    Document 6-7    Filed 04/04/2008    Page 24 of 24

**From:**  JANET HOWARD
**Subject:**  Fwd: Memorandum of Understanding

>>> JANET HOWARD 7/27/2007 3 41 PM >>>
Glenn and Todd.

Please see attached Memorandum of Understanding of issues discussed this morning

Thank you.

Janet