UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANET HOWARD ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | Civil Action No. 08-421 (PLF) |
| ) | |
| CARLOS GUTIERREZ, Secretary ) | |
| U.S. Department of Commerce ) | |
| ) | |
| Defendant ) | |

PLAINTIFF'S RESPONSE TO ORDER #2: MOTION FOR A TEMPORARY
RESTRAINING ORDER PRELIMINARY INJUNCTION IN CIVIL ACTION
NO. 08-421

In complying with Honorable Judge Paul Freidman's request for Affidavits or

declarations on April 7, 2008, enclosed are the following:

1. Exhibit 1- Declaration of Dr. Reginald D. Wills, MD.

2. Exhibit 2- Declaration of Janet Howard

3. Exhibit 3- Declaration of Tanya Ward Jordan

4. Exhibit 4- Declaration of Joyce E. Megginson

Dated April 10, 2008                    Respectfully Submitted,

**RECEIVED**

APR 1 0 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Janet Howard, Pro Se
P.O. Box 1454
Spotsylvania, VA 22553
(202) 482-0717

CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2008, I served on Counsel for the Defendant, Brian P.

Hudak, Assistant United States Attorney, 555 4th Street, NW Washington, DC 20530, a

copy of the foregoing Motion and Declarations in support thereof, U.S. Mail Postage

Prepaid.

Dated:  April 10, 2008

_Janet Howard_

Janet Howard, Pro Se
P.O. Box 1454
Spotsylvania, VA 22553
(202) 482-0717

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANET HOWARD                            )
                                       )
PLAINTIFF,                             )
                                       )
        v.                             )     Civil Action No. 08-421 (PLF)
                                       )
CARLOS GUTIERREZ, Secretary            )
U.S. Department of Commerce            )
                                       )
Defendant                              )

## PROPOSED ORDER

Plaintiff's request for Temporary Restraining Order and Preliminary Injunction

is hereby GRANTED.

It is hereby  ORDERED .

Dated this _____ day of _____, 2008

_____
Judge  Paul L. Friedman

# EXHIBIT 1

## DECLARATION OF DR. REGINALD D. WILLS, MD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANET HOWARD, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| DONALD EVANS, | ) Civil No. 04-0756 (PLF) |
| SECRETARY, | ) |
| U.S. DEPARTMENT OF COMMERCE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF DR. REGINALD D. WILLS

I, Dr. Regnald D. Wills, make the following Declaration pursuant to 28 U.S.C. § 1746:

1.    I make this Declaration based upon personal and professional knowledge, and if sworn in as a witness, I could testify competently to the facts stated herein.

2.    From July 2000 until June 2003, I was one of the Medical Officers for the Department of Commerce ("DOC"), and from June 2003 until March 2004, I was the only Medical Officer for the Department of Commerce.

3.    In August 2002, DOC scheduled a meeting regarding Janet Howard. In attendance at that meeting were the following individuals: Human Resources Representative Diana Shepard; Ms. Howard's supervisors, Tom Andrukonis and Carol Bryant; Administrative Nurse Elaine Eubanks; and myself.

4.    During the August 2002 meeting, Ms. Shepard described Janet Howard as a problem and stated that the DOC needed to develop a strategy to handle this problem.  Ms. Shepard characterized Ms. Howard as the ringleader of a group of people who met in the library and exchanged information.  Ms. Shepard referred to this group as the "library crew." Ms. Shepard stated that DOC had to get rid of Ms. Howard and added that after Ms. Howard was gone, that would be the end of the "library crew."

5.    During that same August 2002 meeting, someone stated that Ms. Howard was working in the library because her office was making her sick, and that Ms. Howard's doctor had not provided adequate documentation to support her working in library as a reasonable accommodation.

6.    Ms. Shepard was apparently not pleased that the DOC was seeking supporting documentation, and she said that this would provide Ms. Howard with another opportunity to

prolong her stay in the library. Ms. Shepard suggested that the DOC decide to deny Ms. Howard's requests for reasonable accommodation based on the information already in the DOC's possession. In addition, Ms. Shepard suggested that the DOC move Ms. Howard from the library and back to her desk in her office. Ms. Shepard also wanted the DOC to then begin disciplining Ms. Howard for poor performance.

7.      In March 2003, Ms. Howard supplied medical documentation from Dr. William Lawson to the DOC. After I received this documentation, I met with Mr. Andrukonis regarding Ms. Howard's requests for reasonable accommodation. During one meeting, Mr. Andrukonis expressed reluctance to meet Ms. Howard's needs and told me that Ms. Howard was requesting was an office that was above her pay grade. He also asked me if I could find another doctor to contradict Dr. Lawson's opinion. After thoroughly reviewing all the medical documentation, I recommended that Ms. Howard's request for reasonable accommodation be granted.

8.      On February 25, 2004, the DOC held another meeting regarding Ms. Howard, after I had recommended that the DOC grant Ms. Howard's request for reasonable accommodation. In attendance at that meeting were the following individuals: Mitch Benowitz of the DOC's General Counsel's Office; another attorney from the DOC's General Counsel's Office (whose name I do not recall); Mr. Andrukonis; Ms. Shepard, and myself. Ms. Howard was not invited to attend this meeting.

9.      The tone of this February 25, 2004 meeting was tense and people expressed hostility towards Ms. Howard. Mr. Benowitz said that the letter I wrote regarding Ms. Howard's request for reasonable accommodation did not represent the best interests of the government. I asked Mr. Benowitz what he meant by "the best interests of the government." Mr. Benowitz explained that he believed that Ms. Howard would bring a lawsuit against the DOC for failing to provide her with reasonable accommodations. Mr. Benowitz believed that if Ms. Howard's case were litigated, then the recommendation letter that I had written would not help the DOC's case against Ms. Howard. Mr. Benowitz went on to explain that he needed me to change my opinion in the recommendation letter. I responded that I would need to talk to him about that issue privately.

10.     During the February 25, 2004 meeting, the group then discussed whether Ms. Howard's request to telecommute should be granted. Certain people in the group believed that telecommuting was not necessary. In an attempt to explain why Ms. Howard should be allowed to telecommute, I explained the seriousness of Ms. Howard's medical condition.

11.     At this meeting Ms. Shepard pointed out that Ms. Howard was leading a major class action litigation against the DOC. At that point, I reminded everyone that my role was to only discuss Ms. Howard's medical issues as they related to her requests for reasonable accommodation. I added that I refused to factor the DOC's dislike for Ms. Howard into my medical recommendation.

2

12.    A day or two after the February 25, 2004 meeting, Mr. Benowitz e-mailed me the language that he wanted me to use in my recommendation report about Ms. Howard's request to telecommute. Later that day, I telephoned Mr. Benowitz and told him that I refused to incorporate his language in my medical report. I explained that the report had been written three months earlier and that Human Resources had already forwarded it to Ms. Howard and her supervisors. In addition, I told Mr. Benowitz that changing my opinion in the report at this time made no sense, and I could not justify doing so. I also clearly stated that I would not participate in illegally discriminatory actions.

13.    On March 26, 2004 less than one month after my telephone conversation with Mr. Benowitz, I was officially removed from my position as the DOC Medical Officer.


I DECLARE under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

9-1-04
Date

Dr. Reginald D. Wills, M.D.

3

# EXHIBIT 2

## DECLARATION OF JANET HOWARD
## PLAINTIFF

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANET HOWARD,) | | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-421 (PLF) |
| | ) | |
| CARLOS GUTIEREZ, Secretary, | ) | |
| U.S. Department of Commerce, | ) | |
| | ) | |
| Defendant, | ) | |

DECLARATION OF JANET HOWARD

I, Janet Howard pursuant to 28 U.S.C. 1746 declare under penalty of perjury that

the following are true and based on my personal knowledge.

1. I am over the age of 18 and am fully competent to make this declaration.

2. I am a Export Compliance Specialist GS-12 employed with the Office of
   Enforcement Analysis (OEA), within the Bureau of Industry Security
   (BIS) within the United States Department of Commerce)"DoC,"
   "Department," "Agency").

3. My primary responsibilities, among others, include reviewing export
   license applications and, where appropriate, recommending End-Use
   Checks. I am responsible for helping to ensure that exports are not sent
   to, and ultimately do not fall into the hands of individuals seeking to harm
   the interests of the United States or its citizens. My position implicates
   national security concerns.

4. My first level supervisor is Todd Willis, GS-1801-15, Assistant Director,
   OEA.

1

5. My second level supervisor is Glenn Krizay, Senior Executive Service, Director, OEA.

6. On February 22, 1995 a timely Class Complaint was filed with the Equal Employment Opportunity Commission (Janet Howard, et al, v. Donald Evans, Secretary U.S. Department of Commerce EEOC No. 100-a1-7429X, Agency No. 95-55-0278) (: EEO Class Complaint") alleged that Commerce engaged in race discrimination against her and a class of similarly situated African American employees who works for Commerce in the Metropolitan area of the District of Columbia.

7. Specifically, I alleged that Commerce had maintained a system of racially discriminatory and subjective employment practices with respect to promotions, awards, performance ratings, career-enhancing work assignments, timely training for advancement, and job assignments. This subjective decision/making in performance evaluations has prevented me from advancing according to merit, and it has disadvantaged me. My supervisor told me that the career lateral position I was in was traditionally reserved for "white males". That same supervisor was overheard saying to a white female, "you are tall and blonde; you will do well here."

8. The Class Complaint was Provisionally Certified at the EEOC in 2000, and certification was re-affirmed in 2001.

9. One June 21, 2001 I was removed from my office location (room 4065) without any provisions.

2

10. Prior to being removed, I informed my first line supervisor Carol Bryant and, my second line supervisor Thomas Andrukonis that my health could be jeopardized if I was removed suddenly.

11. Mr. Andrukonis said, "Maybe the Office of Civil Rights (OCR) or, the Office of General Counsel (OGC) had a desk that I could sit at. The elevator would be the best place, but the doors open up on every floor."

12. Prior to July 22, 2001 with support from the department's physician I requested reasonable accommodation for a medical condition (Refractory Blood Pressure & Post Traumatic Stress Disorder). Instead of receiving a reasonable accommodation, I was placed on a Performance Improvement Plan (PIP).

13. January 17, 2007, I was awarded a Bronze Medal for superior Federal Service.

14. January 21, 2007, I was awarded a within grade increase Remarked: "work performance is at acceptable level of competence".

15. January 21, 2007, I was a Recipient of a "Time off award".

16. February 1, 2007 Four (4) working days later Thomas Andrukonis held progress review to address performance concerns.

17. February 2007 due to attorney failure, the Class Complaint in U.S. District Court was dismissed because the class attorney failed to file for class certification under Rule 23.

18. March 27,2007, I was placed a second 90 day Performance Improvement Plan (PIP)

3

19. March 27, 2007 after being placed on the PIP, I was escorted from OCR by the chief investigator to the health unit where I collapsed and was taken by ambulance and admitted to George Washington University Hospital.  My symptoms were shortness of breath and elevated blood pressure, and distorted vision.

20. Three (3) days after being placed on a PIP two GS-13 Export Compliance Specialist (2) vacancy announcements in my office (OEA) were advertised.

21. March 27, 2007 on physician advice, I was placed on temporary disability for 30 day pending outcome of test.

22. April 27, 2007 the 90-day PIP resumed.

23. May 2, 2007 amended complaint 07-00010, placing me on a PIP disqualified me from competing for the GS-13 Positions.

24. May 5, 2007 EEO representative Charla Sizemore asked who would be periodically reviewing and meeting with me while on the PIP.

25. May 14, 2007, Tom confirmed that he would be reviewing and meeting with me.

26. May 23, 2007 Todd Willis becomes by first line supervisor.

27. May 30, 2007, I had a 2 months PIP review with Tom Andrukonis.  He said "I had 2 PLCs over the last month which is ahead of the pace of 15 a year, and I had 32 screen actions which is three times the pace required of 10 a month.  So overall, things look good in all areas..."

28. June 1, 2007 via FOIA request, I was told-"There are no record of any employee in BIS being on a PIP."

29. July 25, 2007 I e-mailed Wendy Wysong for PIP status.

30. July 27, 2007 I inquired via Memorandum of Understanding to Glenn Krizay and Todd Willis for PIP status

31. July 27, 2007 Glenn Krizay requested my EEO interrogatories request and response for the March 27, 2007 PIP.

32. July 27, 2007, the PIP ends.

33. August 17, 2007 I requested Additional Accommodation for internet access (via laptop computer) from Todd Willis

34. October 1, 2007 Fy-08 Performance Appraisal begin

35. November 13, 2007, I was placed on the third (3) PIP to cover November 13, 2007- January 11, 2008.

36. November 13, 2007, Todd Willis does not know the standards for conducting EUCs. In an email from Todd to Jay Hatfield marked **confidential***, Todd said, "I would like for you and I to review Janet's checks together. First to ensure that I am applying consistency in the standards for conducting Eucs and second I will be working closely with her over the next 60-days to improve her work. Let's discuss the best way to accomplish this and not slow down our processing times, I appreciate your help. Todd".

37. November 27, 2007 via email, Todd tells me that my justifications for requesting EUCs do not meet the standards.

5

38. December 14, 2007, I requested through the Freedom of Information Act, "Performance award date, Time of award, quality step increase award, cash in a flash award and any other types of awards distributed to all employees in the Office of Enforcement Analysis (OEA).

39. January 8, 2008 a letter was sent to the Brian P Hudak, Assistant United States Attorney of the upsurge in harassment to me by the department.

40. February 20, 2008, Jay was promoted to GS-14 OEA Chief.

41. February 27, 2008, I received a Notice of Proposed Removal.

42. February 27, 2008 , ambulance was summoned by health Unit's head nurse (Jean Overdovitz) to take me to George Washington University Hospital.   The symptoms were Elevated blood pressure, shortness of breath, pain in chest and left arm.  I remember the last time I was taken to George Washington Hospital via ambulance I, had to pay for the service. The emergency team and health nurse strongly urged me to go by-way-of ambulance, they were fearful that I may not make it to the hospital without incident.  Since I had just received a Proposed Removal letter, I refused emergency transportation because of the cost.

43. March 11, 2008 Filed in U.S. District Court- "Motion for Temporary Restraining Order (TRO) and Preliminary Injunction and a Motion to Dismiss".

44. March 27, 2008, "Verbal and written response in opposition to proposed removal before Glenn Krizay, Dir. OEA.

45. March 27, 2008, Received Defendant's Summary Judgment.

6

46. April 4, 2008, I submitted Plaintiff's reply in support of Motion for a preliminary Injunction and for an Expedited Hearing, and Opposition to Defendant's Motion to Dismiss.

47. April 7, 2008, I submitted Plaintiff reply brief in support of Motion for Preliminary Injunction and for an Expedited Hearing and Opposition to Defendant's Motion to Dismiss.

48. April 9, 2008, the Pre-trial hearing for April 9, 2008 was cancelled.

49. April 11, 2008, Affidavits or declarations are to be filed.

50. April 14, 2008, Pre-trial conference is rescheduled for April 14, 2008.

51. April 21, 2008, Trial is scheduled for April 21, 2008.


Further declarant sayeth not.


April 10,2008                     Janet Howard
_____                  _____
Date                             Janet Howard

# EXHIBIT 3

## DECLARATION OF TANYA WARD JORDAN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANET HOWARD | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Civil Action No. 08-421 (PLF) |
| | ) | |
| CARLOS GUTIERREZ, Secretary, | ) | |
| U.S. Department of Commerce, | ) | |
| | ) | |
| Defendant. | ) | |

-------------------------------------------------------

## DECLARATION OF TANYA WARD JORDAN

I, Tanya Ward Jordan, pursuant to 28 U.S.C. §1746, declare under penalty of perjury that the

following are true and based on my personal knowledge:

1.      I am over the age of 18 and am fully competent to make this declaration.

2.      I am an employee of the Office of the Secretary (O/S) within the United States

Department of Commerce ("DOC," "Department," "Agency").  I have worked for the O/S since

circa May 1987.

3.      I am presently on worker's compensation due to the DOC's failure to provide me with

reasonable accommodation thereby creating a medical condition; and exacerbating a pre-existing

medical condition.

4.      The O/S provides program leadership for the department's functions and exercises

general oversight of its operating agencies, including the Bureau of Industry Standards where

Plaintiff Janet Howard is employed.

5.      During my tenure at Commerce, I have held positions both in the O/S finance and budget

offices and have been privy to budget and informational data concerning Plaintiff Janet Howard.

1

6.    I first became acquainted with Plaintiff Janet Howard circa 1998 through her leadership role in addressing EEO concerns of DOC's African-American employees.

7.    I am aware that Ms. Howard initially filed a class complaint against the DOC in 1995.   I joined Ms. Howard and Joyce E. Megginson in filing a class lawsuit against DOC circa 2005. Consequently, I have been privy to information regarding Ms. Howard's allegations.

8.    For a significant period both Ms. Howard and I were governed by the same Departmental administrative procedures, and serviced by the same personnel office.

9.    For a time while at the DOC, I served as both Vice President and Acting President of Commerce's Ronald H. Brown Blacks in Government Chapter.

10.    I am aware of the discrimination and retaliation Ms. Howard endured and continues to endure as an employee of the Department.

11.    **I am aware of DOC's actions that created a hostile environment for Ms. Howard due to her challenging DOC violations of her civil rights, which as a consequence caused DOC to expend dollars estimated in the millions.**

12.    In 2001, as the Audit Liaison within the Office of Executive Budgeting I conducted oversight and follow-up activity of various departmental activities.  During this time, I witnessed Ms. Howard's name being prominently displayed in the widely circulated DOC's *Advances and Reimbursement Handbook.*

13.    The DOC's *Advances and Reimbursement Handbook* was heavily distributed Departmentwide to **ALL bureaus**.  The document was also distributed externally.  This document published that "Janet Howard" had filed a complaint against the DOC and stated: *"the class action involves employees from all operating units of the Department of Commerce"* and that *"each bureau"* would be charged on an monthly automatic basis.  In FY 2001, DOC created

2

a "Special Fund Project 7031000 - Class Action Suit" which specifically and solely named Ms. Howard's complaint against DOC's Secretary.

14.    In my capacity as DOC's Audit Liaison, I also witnessed a *"contingent liability list"* that identified Ms. Howard as a Plaintiff challenging race discrimination practices executed by the DoC.

15.    As DOC's Audit Liaison, when conducting an Activity Based Cost study on man-hours the Office of Civil Rights (OCR) expended, I observed Ms. Howard's name posted on virtually every desk and / or personal computer of the DOC employee I met with.

16.    I am aware that DOC denied Ms. Howard telework as prescribed by her medical doctor. This is inconsistent with DOC's targeted goal to provide 100% telework opportunity to all eligible employees.

17.    Despite our working in two different bureaus, Ms. Howard and I both worked in bureaus based at the Hoover Building in Washington, DC and, as reported by both DOC and the General Accountability Office, have missions related to or support for trade development, reporting, assistance, regulation, and oversight.

18.    Plaintiff Howard and I also have interfaced with the same supervisors and personnel officials.  For example, a former supervisor of Ms. Howard (Bob Kugelman) later became my second line supervisor.   Mary King, a personnel official, once serviced both our bureaus.

19.    I am aware that Ms. Howard engaged in a number of FOIA requests that suggested potential waste as to how the DOC handled funds related to the Class Action Project.  I am aware that Ms. Howard reported her concerns to the Office of Inspector General.

3

20.    I witnessed Ms. Howard being displaced from her office and having to sit, for circa a year or more, in the DOC library because she was not given reasonable accommodations based on her medical needs.

21.    A number of years ago, I had to escort Ms. Howard by ambulance to George Washington Hospital because her blood pressure rose to such grave levels that the DOC Health Unit instructed that Ms. Howard receive immediate care.

22.    Based on my observations, understanding of documents, and discussions with other DOC employees, I believe Ms. Howard has been targeted for removal due to her activism in addressing the U.S. Department of Commerce's violations of her civil rights.


Further declarant sayeth not.



Tanya Ward Jordan                                          April  9, 2008

4

# EXHIBIT 4

## DECLARATION OF JOYCE E. MEGGINSON

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JANET HOWARD<br><br>PLAINTIFF,<br><br>v.<br><br>CARLOS GUTIERREZ, Secretary<br>U.S. Department of Commerce<br><br>Defendant | Civil Action No. 08-421 (PLF) |

## DECLARATION OF JOYCE E. MEGGINSON

I, Joyce E. Megginson pursuant to 28U.S.C. 5 1746, declare under penalty of perjury that the following are true and based on my personal knowledge.

1.   I am over the age of 18 and am fully competent to make this declaration.

2.   I am an employee of the National Telecommunications and Information Administration (NTIA), which is contained in the United States Department of Commerce ("DOC," "Department," "Agency").

3.   I have worked for the National Telecommunications since 1971. I am presently on worker's compensation due to an on the job jury as a result of a hostile work environment (post traumatic stress disorder (PTSD)).

4.   I first became acquainted with Plaintiff Janet Howard in 1994 through her leadership role in addressing the EEO concerns of African American employees at the DOC.

1

5.   Ms. Howard initially filed a class action complaint against the DOC in 1995.  I jointed Ms. Howard and Tanya Ward Jordan in filing a class action claim in U.S. District Court against the DOC on October 5, 2005.  Consequently, I have been privy to all information regarding Ms. Howard's allegations.

6.   For a significant period of time, both Ms. Howard and I were governed by the same Departmental personnel procedures and services by the same personnel office.

7.   As a lifetime member of Blacks in Government (BIG), Ronald H. Brown Chapter as an executive member, in that capacity I was also aware of Plaintiff's EEO concerns.

8.   I am fully aware of the incidents of retaliation by BIS management toward Ms. Howard as an employee of the Bureau Industries Security at the DOC.

9.   I am further aware of Commerce's actions that has created a hostile work environment for Ms. Howard as a result of her challenging DOC's violations of her civil rights, which as a consequence has resulted in costing the DOC dollars estimated in the millions.

10.   On June 28, 2001, Ms. Howard contacted me and requested that I meet one of her physicians, Dr. Warren M. Mebane, to pick up a medical reported. At that time Ms. Howard was sitting in on dispositions of class action complainants being deposed by the DOC for the class action complaint.

11.   I have first hand knowledge of some of the medical conditions of Ms. Howard, and on several occasions have accompanied her to the emergency room at GW Hospital as a result of elevated blood pressure cased by a hostile work

2

environment. I will only focus on the more recent trips that I that I believe was directly connected to the hostile work environment at the DOC. These trips were related to Ms. Howard's elevated blood pressure that was a result of discriminatory, adverse and questionable personnel actions taken against Ms. Howard.

12.    I have personal knowledge of Ms. Howard's many trips to the DOC health room where she is required to rest due to her elevated blood pressure.

13.    On March 27, 2007, after Ms. Howard received notification that she was being placed on a 90 day Performance Improvement Plan (PIP) she telephone me to advise me of this questionable adverse personnel action.    Later she again called me to inform me that she was being escorted from the Office of Civil Rights (OCR) by the Chief Investigator to DOC's health room.    Shortly thereafter I received another call from Ms. Howard who informed me that she had collapsed in the health room and was being transported via ambulance to GW Hospital, where she was admitted.    After receiving this call from Ms. Howard, I immediately left my home to visit Ms. Howard at GW Hospital where I remained with her until well past 9:00 p.m.

14.    November 13, 2007 Ms. Howard called to inform me that she had been placed on another PIP.

15.    On February 27, 2008 Ms. Howard called me to inform me that she had received a Notice of Proposed Removal from Todd Willis.

16.    A short while later, I received a call from Ms. Howard informing me that once again she was experiencing lightheadedness and a shortness of breath, I advised

3

her to immediately seek medical attention in DOC's health Room. {Feb. 27, 2008}

17. Knowing Ms. Howard's medical condition, out of concern, I left home to go to the DOC's health room. {Feb. 27, 2008}

18. When I arrived at DOC's health room, Nurse Jane Overdovitz explained to me that Ms. Howard's blood pressure had elevated to a dangerous level. {Feb. 27, 2008}

19. A short time later as I waited in the reception area of the health room, Nurse Overdovitz advised me that they were really concerned about Ms. Howard's condition and had called for an ambulance. {Feb. 27, 2008}

20. When the ambulance arrived, for financial reasons, Ms. Howard refused to be transported to GW Hospital. {Feb. 27, 2008}

21. Because of the serious condition of Ms. Howard, both the emergency medical technicians (EMTs) and Nurse Overdovitz spoke directly with me and asked me to try and convince Ms. Howard to be escorted via ambulance to GW Hospital. {Feb. 27, 2008}

22. After speaking to Ms. Howard who informed me that the last time she was transported to GW Hospital via ambulance, she had to pay for that service and she just could not afford to do so this time. {Feb. 27, 2008}

23. Nurse Overdovitz again spoke with me and advised me that due to the serious nature of Ms. Howard condition that she was thinking about having Ms. Howard to sign a release form because she was concerned whether or not Ms. Howard would make it to GW Hospital by private auto. {Feb. 27, 2008})

4

24. The EMTs carried Ms. Howard to the main entrance of DOC where she was placed in my car. {Feb. 27, 2008}

25. I carried Ms. Howard to GW Hospital where she received immediate medical treatment in the emergency room. {Feb. 27, 2008}

26. It was determined that because of Ms. Howard's dangerously elevated blood pressure that she would be admitted. {Feb. 27, 2008}

27. I stayed at GW Hospital until approximately 8:00 p.m., shortly thereafter Ms. Howard was transported to her private room. {Feb. 27, 2008}

28. On February 28, 2008 after Ms. Howard's release from GW Hospital I picked her up.

29. Based on my observations, understanding of documents that I have been privy to and discussions with Ms. Howard and other DOC employees, I unequivocally believe that Ms. Howard has been targeted for removal due to her role as class agent and her activism in addressing the DOC with regards to continuous violations of her civil rights.

Further declarant sayeth not

Joyce E. Megginson                          Apr. 10, 2008
Joyce E. Megginson                          Date

5